CARL N., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF FAMILY & YOUTH SERVICES, Appellee.

No. S–11213.

Supreme Court of Alaska.

Dec. 10, 2004.

Sharon Barr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I.  INTRODUCTION

The father of an Indian child appeals the termination of his parental rights.  He challenges three findings of the superior court: (1) that he failed to remedy the conduct that had placed his child at risk of harm;  (2) that returning the child to the father would likely result in serious emotional harm;  and (3) that the termination was in the child's best interests.  Specifically, the father argues that he was diagnosed with bipolar disorder just months before the termination trial, and that he was making significant progress and was leading a sober, stable lifestyle by the time of the trial.  He also argues that the child's severe emotional problems made adoption unlikely, and therefore that working toward reunification with the father was in the child's best interests.  Because the record supports each of the superior court's

findings, we affirm the termination of parental rights.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

Caden, an Indian child under the Indian Child Welfare Act (ICWA),[1] was born to Carl and Karen on January 11, 1994.[2]  Carl lived with Karen and his son for eight months before he was incarcerated in September 1994.  When he was released in June 1995, he spent a month with the child and the mother until a domestic violence order was issued against him.

In August 1995 Karen voluntarily placed Caden in state custody because she felt unable to care for him.  Karen originally expressed an interest in giving Caden up for adoption but agreed to work toward reunification when Carl opposed the adoption.  For nine months to a year Carl moved to Fairbanks and was "essentially not in touch" with Caden.  In her August 1997 affidavit, a social worker with the Division of Family and Youth Services (DFYS) stated that Karen had successfully completed her case plan, but that Carl had not complied with the case plan and only visited Caden sporadically.  In September 1997 the superior court returned Caden to his mother's custody.

In 1997 Carl was convicted of larceny and spent part of 1997 and 1998 in jail.  In 1999 Karen, who had had a second child with another man, was homeless and having difficulties caring for Caden and his half-brother.  Caden went to live with his father, while his half-brother was taken into the state's custody.  Caden lived with Carl from June 1999 until November 1999.  On November 4, 1999, DFYS removed Caden from Carl's care and placed him in a foster home.  DFYS assumed custody of the child because Carl had left Caden with Karen even though DFYS had warned him that it was not safe to do so, and because DFYS was concerned about Carl's criminal history and his prior failure to complete a case plan.  Both parents stipulated that Caden was a child in need of aid.

In November 1999 DFYS prepared a case plan to return Caden home.  The case plan specified adoption as a concurrent plan goal, stating: "Parents may continue to work on goals to have their children return home, but it must be understood that it is a time limited process."

The case plan called for Carl to address any substance abuse and mental health issues prior to reunification with his son.  Carl has a history of depression and drug and alcohol dependence.  In January 2000 Carl received a substance abuse assessment that recommended outpatient treatment.  He completed a sixteen-hour chemical dependency program but did not complete an outpatient treatment program.  At this time his caseworker expressed concern that Carl was not visiting Caden regularly and that this inconsistency caused Caden to become angry and fearful.

Carl was arrested in May 2000.  From that time until August 2002 he never lived independently in the community; he was in jail, in a halfway house, under house arrest, or in a residential treatment facility.  He entered a residential treatment program in November 2000 and completed the program in February 2001.  That month, he was convicted of failing to stop at the direction of an officer and again placed in jail.  While at a halfway house in the fall of 2001, Carl entered an outpatient substance abuse program and completed the program in April 2002.  In June 2002 he had a cocaine relapse.  He turned himself in and was returned to jail.  He was released on parole in August 2002.

In August 2002 Carl was diagnosed for the first time with bipolar disorder and began treatment.  After his release from jail he attended one treatment team meeting for Caden but then stopped contacting the department; the social worker was unable to locate him for months.  In September his parole officer placed him in a urinalysis program.  He provided a dilute sample at his first appointment and failed to appear for additional urinalysis appointments.  After his September meeting with his parole officer,

1.  25 U.S.C. §§ 1901–23, 1951 (2002).

2.  This opinion uses pseudonyms for all family members.

he absconded from parole and was arrested in January 2003. He was released eleven days later and placed in an intensive surveillance parole program. He was still in that program during the termination trial in March 2003. At the time of the trial he had successfully completed three weeks of urinalysis monitoring.

At the time of the termination trial, Caden was nine years old. He had been diagnosed with bipolar and post traumatic stress disorders. Psychologist Susan LaGrande testified at the trial that the post traumatic stress disorder appeared to relate to "the instability or kind of chronic maltreatment, neglect, and instability in his home life." Caden was prone to tantrums and episodes of rage that placed himself and others in danger. His behavior led to several hospitalizations, including a lengthy stay that ended just weeks before the trial.

At the time of the trial, Caden had been in the same foster home placement for nineteen months. Shortly before the trial his foster mother told DFYS that she was no longer considering adopting Caden because of his escalating behavioral problems and hospitalizations. DFYS considered sending Caden to a residential treatment program. When Caden's doctor and Dr. LaGrande advised DFYS that Caden was not a good candidate for residential treatment and recommended that he be returned to his foster mother, DFYS reversed course. According to Dr. LaGrande's testimony, although the foster mother was not willing to take on the responsibility of adopting Caden, she was willing to take care of him until he turned eighteen, "given the limitations that if he's not able to maintain or services aren't sufficient to help her maintain it then another decision is going to have to be made." At the time of the trial DFYS was considering two different options for Caden: locating a permanent adoptive family, and keeping him in his current foster placement. Dr. LaGrande testified that in her experience it was difficult to find an adoptive family for a child with emotional difficulties as severe as Caden's. DFYS was open to the possibility that Carl could continue to play a role in his son's life provided that he demonstrated stability and that, if

Caden were adopted, his adoptive parents did not object.

## B. Proceedings

The Department of Health and Social Services filed a petition to terminate Carl and Karen's parental rights on March 26, 2002. The termination trial was held in March 2003. Karen voluntarily relinquished her parental rights during the trial.

Dr. LaGrande testified that because of Carl's recent history of substance abuse and mental illness he was unable to act as Caden's parent. She testified that to work toward reunification, Carl would have to demonstrate that he was clean and sober for a full year, and would then have to treat his mental health issues and establish a track record of stability. She estimated that it would be at least two years before reunification could seriously be considered.

Dr. LaGrande also testified that the uncertainty surrounding Caden's living situation was psychologically draining for the child and was impeding his development. According to LaGrande, Caden needed to know that the home where he lived would be his home "for a long period of time in the future" so that he could settle down and focus on his behavior at home and his relationship with his foster parent. Dr. LaGrande concluded that it was in Caden's best interests to resolve the issue of his father's parental rights quickly. Social worker Vivian Patton and Caden's therapist, Gregory Galanos, also testified that it was important for the parental rights issue to be resolved so that Caden could move on psychologically and achieve permanence and stability in his home life.

Carl also testified at the trial. Carl's attorney argued that Carl had only recently been correctly diagnosed and treated for his bipolar disorder and that he had made significant progress in the months prior to trial. He also argued that the state had failed to meet its burden for the termination of parental rights under ICWA and Child in Need of Aid (CINA) Rule 18.

The superior court made oral findings of fact and conclusions of law on April 15, 2003 and entered an order terminating Carl's pa-

rental rights on August 18, 2003. The court found by clear and convincing evidence that Caden was a child in need of aid due to abandonment, neglect, substance abuse, and mental illness, and that Carl had not remedied the conditions that placed Caden at substantial risk of harm. The court found that Carl was "not past his bipolar disorder" and that he was "at best ... in the initial stages of recovery" from substance abuse. The court expressed concern that as recently as the fall of 2002, Carl had failed to report to his parole officer or comply with urinalysis testing. The court also found beyond a reasonable doubt that returning Caden to Carl's custody would result in serious emotional damage to Caden. In making this determination, the court relied in part on the expert testimony of Dr. LaGrande. The court stated that Caden has severe behavioral problems and expressed concern that Carl "does not have real insight into his child's problems and how to deal with those problems." The court found that if Carl and Caden were reunited, it is likely that Carl would "abdicate the responsibility of parenthood," causing "very serious" emotional damage to the child.

Finally, the court found that termination of parental rights was in the best interests of the child. Noting that Caden's problems stemmed in part from instability in his home life, the court found that leaving open the prospect of reunification with his father "would mean more years of instability and a real likelihood that it would not come to fruition." The court concluded that termination of parental rights "would give [Caden] an opportunity to have a start; to find a therapeutic foster home or adoptive home and at least have the prospect of real stability in the remaining years of his childhood."

Carl appeals.

3. AS 47.10.088(a)(1)(A); CINA Rule 18(c)(1)(A).

4. AS 47.10.088(a)(1)(B); CINA Rule 18(c)(1)(A).

5. 25 U.S.C. § 1912(d) (2002); CINA Rule 18(c)(2)(B).

6. CINA Rule 18(c)(2)(C).

7. 25 U.S.C. § 1912(f) (2002); CINA Rule 18(c)(3).

## III. DISCUSSION

Termination of parental rights to an Indian child under ICWA and the CINA rules and statutes requires that the superior court make five findings. The trial court must find by clear and convincing evidence that the child is in need of aid as described in AS 47.10.011[3] and that the parent has not remedied, within a reasonable time, the conduct or conditions in the home that place the child at substantial risk of physical or mental injury.[4] The court must find by a preponderance of the evidence that the department has made active but unsuccessful efforts to provide services and programs designed to prevent the breakup of the family[5] and that termination of parental rights is in the child's best interests.[6] Finally, the court must find by evidence beyond a reasonable doubt, including qualified expert testimony, that continued parental custody is likely to cause serious emotional or physical damage to the child.[7]

In this case, Carl challenges three of the superior court's findings: (1) that Carl has not remedied the conduct that placed Caden at substantial risk of harm; (2) that return of Caden to Carl's custody was likely to result in serious emotional damage to Caden; and (3) that the termination of parental rights was in Caden's best interests.

### A. Standard of Review

"In a child in need of aid case, we will affirm the superior court's factual findings unless they are clearly erroneous."[8] Whether the superior court's findings comport with the requirements of ICWA or the CINA statutes and rules is a question of law that we review de novo.[9]

8. *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004).

9. *Sherry R. v. State, Dep't of Health & Soc. Servs.*, 74 P.3d 896, 901(Alaska 2003) (CINA rules and statutes); *J.J. v. State, Dep't of Health & Soc. Servs.*, 38 P.3d 7, 8 (Alaska 2001) (ICWA).

## B. The Superior Court Did Not Err in Finding that Carl Failed To Remedy the Conduct that Placed Caden at Risk Within a Reasonable Time.

■ Carl argues that the superior court erred in finding that he had failed to remedy his conduct within a reasonable time. He contends that his life has turned around since he was correctly diagnosed and treated for bipolar disorder, and that in the eight months between the diagnosis and the trial he had stayed sober and made substantial progress in creating an emotionally and financially stable environment for the return of his son. He argues that his past drug treatment failures are not predictive of his future conduct and that the court should have focused on his behavior after the diagnosis was made.

· But the record does not support Carl's assertion that his conduct changed dramatically once he began treatment for bipolar disorder in August 2002. It is true that the social worker testified that her meetings with Carl in the weeks before the trial were much more positive than those in the past and that he seemed to be making progress in identifying and working on his problems. But in the months after his diagnosis, he also submitted a dilute urine sample, failed to appear for urinalysis tests, absconded from parole, and failed to maintain contact with Caden's social worker. At the termination trial, Carl's proven track record of sobriety amounted to three weeks of successful urinalysis monitoring as part of an intensive surveillance parole program.

In determining whether a parent has failed to remedy his conduct within a reasonable time, courts may consider any fact relating to the best interests of the child, including "the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs." [10] Dr. LaGrande estimated that even if Carl continued to make progress it would be at least two years before he could be reunified with Caden. Given the evidence in the record that Caden needs to achieve stability and permanence, the superior court could reasonably find, as it did, that Carl's recent efforts were "too little, too late." [11]

## C. The Superior Court Did Not Err in Finding that Returning Caden to Carl Would Likely Result in Serious Emotional Damage.

Carl argues that the superior court also erred in finding that the state met its burden of proving beyond a reasonable doubt that returning Caden to Carl's custody would likely result in serious emotional damage to Caden. The superior court's determination is supported by expert testimony in the record. Dr. LaGrande testified that Caden is severely disturbed and that he needs stable, consistent parenting in order to learn to manage his behavior. She testified that Carl did not have the requisite stability and parenting skills, stating that if Caden were placed with his father, he "isn't going to continue to grow, he's going to ... continue to have a decline in his behavior." Moreover, Carl has at times failed to visit Caden regularly; Carl dropped out of contact with DFYS for several months, less than a year before the trial. The record supports the superior court's finding that if Carl were given custody he would likely "abdicate the responsibility of parenthood" and drop out of Caden's life, a scenario that Dr. LaGrande testified would cause Caden serious psychological harm.

Carl argues that *State, Department of Health & Social Services v. M.L.L.*[12] supports his argument. In *M.L.L.*, we affirmed the trial court's finding that the state had not met its burden under ICWA for termination of parental rights.[13] In that case, we stressed that much of the past conduct that had put the children at risk had been sufficiently remedied to create a reasonable doubt as to future harm. The mother in *M.L.L.* had, for example, been sober for over

10. ‘AS 47.10.088(b)(1).

11. *Cf. J.H. v. State, Dep't of Health & Soc. Servs.,* 30 P.3d 79, 86–87 (Alaska 2001) (holding that despite mother's progress in attempting to conquer substance abuse, she had failed to remedy her conduct within a reasonable time).

12. 61 P.3d 438 (Alaska 2002).

13. *Id.* at 445.

three years and had maintained a violence-free household with a new husband.[14] Carl, by contrast, has not remedied the conduct that originally put Caden at risk of harm. The superior court did not err in finding beyond a reasonable doubt that returning Caden to Carl's custody would likely result in serious emotional harm.

**D. The Superior Court Did Not Err in Finding that Terminating Carl's Parental Rights Was in the Best Interests of the Child.**

Carl also argues that the superior court erred in finding that the termination was in Caden's best interests. He points out that Caden's foster parent was not interested in adoption, and that Dr. LaGrande testified that it could be difficult to find adoptive parents for a child with such severe emotional problems. He argues that termination would not lead to a permanent placement for Caden and that allowing Carl to work toward reunification would give Caden his best chance at stability and permanence.

The state argues that its plan—pursuing the possibility of adoption while considering whether it would be better for Caden to remain with his foster parent for the remainder of his childhood—was the best approach. The state points to evidence in the record that the foster parent was committed to caring for Caden until he turned eighteen provided that his behavior remained under control. The state also emphasizes that regardless of his placement, Caden needed to resolve the issue of his father's parental rights because the continuing uncertainty about whether he would return to his father was harming him and impeding his development.

The record supports the superior court's finding that the termination would be in Caden's best interests. Dr. LaGrande, social worker Patton, and Caden's therapist all testified that the resolution of the parental rights issue was important to Caden's emotional well-being. When asked whether the

foster parent's decision not to adopt Caden changed her opinion that Carl's parental rights should be terminated, Dr. LaGrande responded:

> No, I think the parental rights issue still needs to be resolved so that he understands that piece.... [T]hat's a thing that's not going to happen, he's not going home, he has to focus on his behavior here and focus on that relationship with [the foster parent]. I—I think that to have it hanging out there, that uncertainty, in my experience is very draining on kids.

At the time of the termination trial, Caden had been in the state's custody for over three years. Dr. LaGrande testified that it would be at least another two years before Caden could be reunified with Carl. It was not clearly erroneous for the superior court to find that Caden needed stability and could not afford to wait any longer for Carl to be ready to serve as his parent.[15]

## IV. CONCLUSION

Because the record supports each of the superior court's challenged findings, we AF-FIRM the termination of Carl's parental rights.

---

**14.** *Id.* at 443–44.

**15.** *See J.H.,* 30 P.3d at 87 (upholding finding that termination was in child's best interests where mother had at times showed significant progress in treating substance abuse problem but child needed stability and could not afford to wait any longer for mother to be ready to provide maternal relationship).