NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CAMILLE H., | ) | |
| | ) | Supreme Court No. S-14265 |
| Appellant, | ) | |
| | ) | Superior Court Nos. |
| v. | ) | 3AN-08-00401/402 CN |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 1419 – May 10, 2012 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge.

Appearances: Janella Combs Kamai, Johnson & Combs, PC, Kodiak, for Appellant. Megan R. Webb, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices, and Eastaugh, Senior Justice.**

---

\*      Entered pursuant to Appellate Rule 214.

\*\*      Sitting by assignment under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

# I. INTRODUCTION

The superior court terminated a mother's parental rights to her two special needs Native children. The mother now challenges four of the five findings required to terminate her parental rights. She claims on appeal that their father was available to care for them and that therefore the court clearly erred in finding the children to be in need of aid. She also challenges the court's active efforts finding, arguing that the Alaska Office of Children's Services (OCS) failed to assist her with her mental health issues. Because the superior court did not err as a matter of law and because its fact findings were not clearly erroneous, we affirm.

# II. FACTS AND PROCEEDINGS

## A. Facts

Camille and Stephen H. are the parents of Joshua and Derrick.[1] Joshua, born in December 2001, and Derrick, born in December 2003, are Indian children within the meaning of the Indian Child Welfare Act (ICWA).[2] The superior court issued a single decision terminating the parental rights of both parents. Each parent separately appealed. We addressed the father's appellate contentions and affirmed the termination of his parental rights in *Stephen H. v. State, Department of Health & Social Services, Office of Children's Services*.[3]

---

[1]    We use pseudonyms for all family members.

[2]    25 U.S.C. § 1903(4) (2006).

[3]    Mem. Op. & J. No. 1400, 2011 WL 6004352 (Alaska, Nov. 30, 2011). The rights of both parents were terminated in the same superior court proceeding, but they were represented by different counsel at trial and in their separate appeals.

### 1. The children's special needs

What we said about the children's special needs when we resolved the father's appeal in *Stephen H.* equally applies to Camille's appeal:

> Joshua has been diagnosed with static encephalopathy (non-progressive brain dysfunction). This condition has various causes, including in utero alcohol exposure and early life experiences. At the time of the trial Joshua was in the third grade, but his foster mother believed that he had the mental processing ability of a three- or four-year old. This includes difficulty understanding the concept of time and, organizing multiple-step tasks without reminders, and requires a structured schedule. Proper management of Joshua's needs requires stability and security. . . . [U]pon removal from Stephen and Camille's care he was in need of vision and dental care.
>
> . . . .
>
> Derrick is the younger son and suffers from significant physical, developmental, and cognitive deficits as a result of an idiopathic chromosomal abnormality. He gets sick often, has brittle bones, and requires 24-hour attention. Derrick is unable to eat solid foods; he is fed through a gastronomy tube (G-tube). He still wears diapers and is susceptible to bowel obstruction and other digestive problems. . . . He has a 15-20 word vocabulary. . . . Derrick is unlikely to be able to live independently and will require increasingly challenging care as he grows older.[4]

### 2. Camille's mental health

Camille testified at trial that anxiety was her only existing mental health issue. A doctor at the Alaska Native Medical Center prescribed her Hydroxozine three to five times a day for anxiety and panic attacks. The record does not reflect when this prescription was issued. At trial Camille testified that she was taking medication for

---

**4**   *Id.* at *1.

anxiety but was not seeing a doctor.[5]  Camille also has a history of mental health problems.  Camille's grandmother physically abused her, and beginning when Camille was nine or ten, a family member sexually abused her for three to four years.  Camille reported that she received weekly mental health counseling at the Cook Inlet Tribal Council "for a long time."  Camille attempted suicide at ages 14 and 15.  She was admitted to inpatient psychiatric care following those two attempts.  During a June 2009 substance abuse intake assessment Camille reported that she had made no subsequent suicide attempts, and had not thought of suicide for eight or nine years.  At the time of the OCS intake assessment Camille was 33; at the time of trial she was 35.

### 3.      The parents' substance abuse

Camille reported regular alcohol use from age 21.  Catherine Gage, a substance abuse assessment counselor at the Salvation Army Clitheroe Center (Clitheroe), provided expert testimony regarding Camille's substance abuse.  Gage

---

[5]      Camille testified:

Q:    [D]o you have mental health issues?
A:    Probably just for anxiety.
Q:    Okay. And do you have medical issues other than anxiety?
A:    No.
Q:    Do you see anybody for the anxiety?
A:    No.
Q:    Do you take medication for it?
A:    Yeah.
Q:    Okay.  And who is that through? . . .
A:    Dr. Hickel.
Q:    Is that at Alaska Native Medical Center?
A:    Yeah.
Q:    And other than anxiety, do you have . . . any other serious medical condition?
A:    No.

conducted two substance abuse evaluations of Camille and diagnosed her with alcohol dependence. Gage observed that Camille's use of alcohol had a "significant impact" on her independent functioning and recommended that Camille participate in long-term treatment.

In July 2008 Camille was picked up twice the same day by the Community Service Patrol, first with a .176 percent breath alcohol content (BrAC) and again a few hours later with a .161 BrAC. In September 2008 Camille was arrested for driving under the influence; a breathalyzer test showed she had a .346 BrAC. She was picked up later that month and again the following month with a .159 and a .205 BrAC, respectively.

Stephen also has a history of alcohol abuse and the couple had an unstable living situation. As we stated in *Stephen H.*:

> In July 2008, Stephen was arrested for driving under the influence and lost his job as a truck driver; he has not worked since that time. Camille has been unemployed since August 2007. In early 2010, the family's home was foreclosed upon. At the time of trial, Stephen and Camille remained married and resided at a shelter.[6]

### 4. OCS custody and the children's foster care placements

What we said in *Stephen H.* regarding OCS's involvement with the family applies to the mother's appeal as well:

> On November 17, 2008, the police responded to a report that Stephen and Camille were intoxicated while the children were in their care.[4] According to a breathalyzer test administered at the scene, Camille had a .310 percent breath alcohol content and Stephen a .123 percent breath alcohol content. The police waited for a sober relative to arrive and forwarded the case to OCS. OCS developed a safety plan

---

[6]    2011 WL 6004352, at *2.

and referred Stephen and Camille to substance abuse assessments and parenting classes.

In early December 2008, Stephen was arrested during a domestic dispute that involved alcohol. As a result he was incarcerated [for four months]. Because Camille admitted to drinking, OCS implemented a new safety plan. Under that plan, Camille's mother agreed to move into the home if Camille did not drink. Later that month, Camille's mother notified OCS that she would be leaving because Camille had been drinking. Stephen's incarceration left the children with no safe caregivers, and so OCS took custody.[7]

_____

    **4**      Prior to that date there were three other reports. Two were deemed unsubstantiated and one resulted in a referral to Cook Inlet Tribal Council.[8]

In *Stephen H.* we also discussed the boys' placements:

Joshua was placed with a non-ICWA-compliant foster home in April 2009 after placement with an aunt and uncle failed because Camille continually called the home in an intoxicated state. His foster family would like to adopt him. They are open to visits with Joshua's brother and continued contact with his biological parents and tribe. However, at the time of trial there had not been any contact between the brothers outside the visits set up by the Office of Children's Services (OCS).

    . . . .

---

    **7**     *Id.*

    **8**     *Id.* at *2 n.4.

Due to Derrick's considerable medical needs he was placed with an appropriate non-ICWA-compliant foster home.[9]

In *Stephen H.* we added these comments about Derrick:

> Derrick attends school but is on what his foster [mother] refers to as a "life plan"; he is not expected to graduate but is taught basic life skills. . . . He usually moves around by military-style crawling, but has a wheel chair and is working towards using a walker. Derrick receives physical, occupational, and speech therapy multiple times per week at home and school. . . . At the time of trial Derrick was 50 pounds and interacted with the other children and pets in the foster home. Derrick's foster family is interested in adopting him. His foster mother is open to contact with Derrick's tribe but she was not asked about maintaining contact with his brother or natural parents.[10]

**5.     Parent-child interactions while the children were in foster care**

OCS made several unsuccessful attempts to schedule visits for Camille with the children while Stephen was incarcerated. Camille twice failed to attend scheduled visits. OCS canceled three visits because Camille was intoxicated. Camille attempted to contact Joshua, but was not allowed to speak with him because she was intoxicated. She did not express interest in visiting Derrick. As we stated in *Stephen H.* about visiting the children:

> After Stephen's release, both Stephen and Camille attended regular visits with the children. . . . Initially the children were reserved and tense, especially towards Camille, but later the visits became more comfortable. Both Stephen and Camille engaged in proper activities with their children. Multiple observers noted that Stephen and Derrick have a special

---

[9]     *Id.* at *1-2.

[10]    *Id.*

bond. Both children appeared to look forward to the visits and were happy to see their parents.[11]

Joshua's foster mother testified that he did not seem upset when visits were canceled. But she admitted that Joshua's lack of response might be due to his static encephalopathy and that she did not try to process the emotions and information with him.

### 6. The case plan

OCS developed a case plan aimed at reunification. OCS was unable to reach Camille until March when she scheduled, but failed to attend, a meeting to discuss the plan. It is unclear when Camille finally met with the caseworker to discuss the plan. Stephen discussed the plan with OCS by telephone. Stephen and Camille stipulated in April 2009 that the children were in need of aid under AS 47.10.011(10).[12] The OCS caseworker reported that since November 2009, she had met with Stephen and Camille at least once or twice a month.

#### a. OCS's efforts to provide Camille with services and programs

The case plan required Camille to attend parenting classes, obtain a substance abuse assessment, complete the Alcohol Safety Action Program, obtain a mental health assessment, and visit the children. Camille completed the Cook Inlet Tribal Council's Mother's Program and a co-parenting class. In June 2009 she completed a substance abuse assessment but failed to follow the recommendations for

---

[11]     *Id.* at *2.

[12]     Under AS 47.10.011(10) a court may find that a child is a child in need of aid if it finds by a preponderance of the evidence that the parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child."

residential treatment. The Community Service Patrol repeatedly picked up Camille for public intoxication over the next six months. Ellyn Lundgren, the family's OCS caseworker, set up two intake appointments for Camille at Stepping Stones, a residential substance abuse treatment program. Camille failed to attend both appointments. Camille did complete an intake assessment at Stepping Stones in December 2009. But as a condition of acceptance, Stepping Stones required that OCS promise to place Joshua with Camille within 30 days of admission. Lundgren testified that OCS could not do so because Camille did not show any "evidence that she had the ability to be sober, to stay sober" and because removing Joshua from his stable foster home would have been "devastating." In *Stephen H*. we described the remainder of OCS's efforts to provide Camille treatment:

> In February 2010, Camille participated in a detoxification program and completed a 45-day residential treatment program [at Clitheroe]. Camille did not participate in aftercare services and relapsed. She entered a transitional housing program but was discharged for non-compliance. She later entered another detoxification program, but did not enter treatment. In January 2011, she participated in another alcohol abuse assessment and it was recommended that she enter a long-term residential program. At the time of trial she had not yet done so.[13]

### b. OCS's efforts to address Camille's mental health issues

Each of Camille's case plans identified managing mental health as an objective, and required Camille to obtain a mental health assessment and follow the assessment's recommendations. The December 2009 updated case plan modified the requirement to state that the mental health assessment "may be a part of the Stepping Stones or other [inpatient] treatment programs." Camille's substance abuse assessments

---

[13]    *Id.* at *3.

recommended she receive mental health evaluation and services. OCS's Lundgren

testified about her efforts to secure mental health services for Camille:

> Q: Did you ever discuss mental health with [Camille and Stephen], any mental health concerns?
>
> A: That wasn't as concerning for [Stephen], but it was for [Camille]. Yes.
>
> Q: And did you talk about that . . . with [Camille]?
>
> A: Yes.
>
> Q: And what was her reaction to that idea?
>
> A: Well, I'll follow up; I'll follow up.
>
> Q: Did you explain to her why you thought it might be important and why it might be able to help her get her children back into her care?
>
> A: Yes. She — she had a history of issues that [are] very difficult to overcome without help. And she had had at some point earlier — much earlier, I think, before OCS was involved — a very full mental health [evaluation] and — and was receiving drugs at [Alaska Native Medical Center] for anxiety.
>
> Q: Did you ever try to set up any appointments for [Camille]?
>
> A: I did.
>
> Q: And what happened with that?
>
> A: At Southcentral. We tried from [Cook Inlet Tribal Council] on two occasions. We tried from my office the day they came in January. I gave her . . . the phone number — we cannot do the intake for them. . . . I called Southcentral. . . . I said, did [Camille] ever call you? And she said, well, we had a call on 11/15, we don't know who it was from. And there was no followup, no phone number left.

### c. OCS's efforts to provide Stephen with services and programs

Stephen's plan was similar: he was required to attend anger management classes, parenting classes, and substance abuse treatment. As we explained in *Stephen H.*:

> Stephen's participation in these required classes was complicated by his incarceration, but upon release Stephen entered into and completed Father's Journey Program, a parenting class, and an anger management course. Additionally, in July 2009 he began an outpatient alcohol abuse treatment program. He was discharged from the program three months later because he missed classes. This caused him to "dr[i]nk for a week straight," because he thought he would be unable to get his children back. He returned for an additional assessment later that year to reenter the outpatient program. Despite recommendations he did not seek treatment at that time.
>
> In July 2010, Stephen entered a residential treatment program. Although he completed the program, his primary counselor was concerned that he had not internalized the treatment and was at risk of relapsing. After completing the program, he agreed to participate in outpatient care, but did not actually do so.[14]

### d. OCS's efforts to assist with housing, employment, and Family Care Court

Lundgren attempted to help Camille and Stephen find employment and secure housing. Lundgren discussed places where Stephen might submit job applications. Camille and Stephen told her that before they could attend interviews they would need lockers for storage. Lundgren requested storage space for them at their shelter, but the shelter only provided lockers to employed residents. OCS twice referred

---

[14] *Id.* at *3.

Camille and Stephen to Family Care Court, but Family Care Court rejected Camille and Stephen both times. Following the second rejection, OCS amended the case plan's child permanency goal to adoption for both children. In July 2010 the Alaska Department of Health and Social Services filed a petition to terminate both parents' parental rights.

## B. Proceedings

Following trial, in April 2011 the superior court, invoking AS 47.10.088, terminated Stephen's and Camille's parental rights and committed the children to OCS custody for the purpose of adoption. Camille appeals.

## III. STANDARD OF REVIEW

We review the superior court's factual findings for clear error.[15] We reverse only if we are left with "a definite and firm conviction that a mistake has been made."[16] We use our independent judgment to review questions of law.[17]

In CINA cases we review for clear error the superior court's factual findings that the State met its evidentiary burden of showing that the children are in need of aid[18] and that termination of parental rights is in the best interests of the children.[19]

---

[15] *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008).

[16] *Id*. (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[17] *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009).

[18] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

[19] *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850 (Alaska 2009) (citing *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 717 (Alaska 2003)).

Whether ICWA's "active efforts" requirement is satisfied presents a mixed question of law and fact.[20] The trial court's decision that the Indian children, if returned to the parent, would likely be harmed presents a mixed question of law and fact.[21] We look to see whether substantial evidence supports the trial court's factual findings supporting its conclusion that the children, if returned to the parent, would likely be harmed.[22] "We review whether a trial court's findings satisfy the statutory requirements of the CINA and ICWA statutes de novo."[23]

## IV.    DISCUSSION

Under ICWA and CINA statutes and rules, a court must make five findings before terminating parental rights to an Indian child.[24] It must find by clear and convincing evidence: (1) that the child is in need of aid;[25] (2) that the parent has not remedied the conduct or conditions in the home that placed the child at substantial risk

---

[20]    *Maisy W.*, 175 P.3d at 1267 (citing *T.F. v. State, Dep't of Health & Soc. Servs.*, 26 P.3d 1089, 1092 (Alaska 2001)).

[21]    *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002) (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 949-50 (Alaska 2000)).

[22]    *Id*.

[23]    *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010) (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

[24]    *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004).

[25]    AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A); AS 47.10.011.

of harm;[26] and (3) that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts proved unsuccessful.[27] The court must find beyond a reasonable doubt, supported by testimony of qualified expert witnesses, that the continued custody is likely to result in serious emotional or physical damage to the child.[28] And finally, the court must find by a preponderance of the evidence that termination of parental rights is in the child's best interests.[29] Camille challenges four of the five required findings.

A. **The Superior Court Did Not Clearly Err In Finding The Children Were In Need Of Aid Under AS 47.10.011(10).**

To terminate parental rights under AS 47.10.011(10) the superior court must find by clear and convincing evidence that a parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the . . . use has resulted in a substantial risk of harm to the child." Camille argues that Stephen was available to care for the children and that therefore the superior court erred in finding that the children were in need of aid under AS 47.10.011(10). She argues that there was "no evidence" to establish that Stephen's use of alcohol "impaired his ability to parent and placed the children at risk of harm." She asserts that as long as Stephen could care for the children, they could not be found to be in need of aid "no matter what on-going issues she may or may not have needed to address."

The State counters that a court may find that a child is in need of aid under AS 47.10.011(10) based on one parent's conduct and that Camille does not challenge the

---

[26]    AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A).

[27]    25 U.S.C. § 1912(d) (2006); CINA Rule 18(c)(2)(B).

[28]    25 U.S.C. § 1912(f) (2006); CINA Rule 18(c)(4).

[29]    AS 47.10.088(c); CINA Rule 18(c)(3).

finding that the children were in need of aid based on *her* conduct. The State argues alternatively that Stephen's alcoholism and incarceration prevented him from safely parenting and that placement with him would have put the children at substantial risk of harm.

We first observe that the briefing in the mother's case was completed in October 2011, shortly before we issued our MO&J resolving the father's appeal. The father there raised the same arguments the mother now raises concerning the father's availability; he likewise minimized the seriousness of his conduct as putting the children at any risk.[30] The mother's appellate briefs raise no new contentions and rely on no facts different than those the father advanced. The father's argument was ultimately unavailing on appeal; in *Stephen H.* we explained why:

> When viewed in the light most favorable to the State, as required by our standard of review, the record contains substantial evidence supporting the superior court's conclusion that Stephen's ability to parent was substantially impaired and this created a substantial risk of harm to the children. Stephen's alcohol problems are long-term, substantial, and as of yet not fully treated. Certainly, the family's problems were exacerbated by Camille's drinking, yet Stephen's alcohol abuse problems also contributed to the overall failure to provide adequate care. Moreover, Camille's drinking had a negative impact on Stephen's alcohol abuse since she was a trigger for his drinking.

> The record shows the impact Stephen's alcohol abuse had on his family. His drinking cost Stephen his job, which directly caused the family to endure serious financial problems, ultimately including their loss of housing. Moreover, while not attributable solely to Stephen, both children had significant medical and psychological needs

---

[30]    *Stephen H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1400, 2011 WL 6004352, at *4 (Alaska, Nov. 30, 2011).

when OCS obtained custody. Derrick was malnourished and his G-tube had not yet healed, while Joshua lacked basic dental and vision care. This shows that not only was there a risk of harm but also that there was actually harm to the children while Stephen was responsible for their care.[31]

Nothing Camille argues in her own appeal would justify a different result on the issue of Stephen's availability to care for the children. We consequently reject her contention that he was available and that the superior court therefore erroneously adjudicated the children to be in need of aid. Our conclusion on that issue makes it unnecessary to decide whether, as OCS argues, the mother's conduct alone would justify affirming the CINA adjudication.

**B.     The Superior Court Did Not Err In Finding That OCS Made Active Efforts To Reunify The Family.**

Camille claims that OCS's efforts to reunify the family consisted of "conversations" and "referrals," "were merely lip service requiring Camille, with no education on these matters, to follow through on her own," and did not amount to "active" efforts as required by ICWA.

The State responds that the court made "detailed" findings of OCS's reunification efforts, including developing the case plan requiring Camille to complete substance abuse and mental health assessments and to participate in parenting classes. The State argues that OCS made efforts to assist Camille with executing the plan by setting up weekly visits with the children, making referrals to the required assessments and classes, and meeting with Camille regularly to keep her on track. Finally, the State asserts that efforts directed towards Stephen and the children are relevant to the "active efforts" determination.

---

[31]    *Id.* at *5 (internal citation omitted).

Camille makes four specific arguments regarding the asserted insufficiency of OCS's efforts.

First, she asserts "there is no record of the Department taking any proactive measures" to assist her with mental health issues which "may have been the underlying cause for the . . . substance abuse issues." Camille concedes that her social worker twice attempted to call Southcentral Foundation and then gave Camille Southcentral's telephone number. The State argues that the court *did* make findings regarding OCS's referrals for mental health services and that Camille's appeal asserts that her mental health is a "more significant" problem than she contended in the trial court.

Before terminating parental rights to an Indian child, the superior court is required by ICWA to find that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[32] When evaluating "whether OCS met its active efforts burden, a court may consider 'a parent's demonstrated lack of willingness to participate in treatment' and look 'to the state's involvement in its entirety.' "[33] The superior court found that OCS made active efforts to provide the parents with services and programs. The court found these efforts included setting up visits with the children, arranging for substance abuse assessments and treatment, discussing mental health treatment, assisting with the job and housing search, and meeting regularly with the parents to discuss the case plan.

Parts II.A.2 and 6.b above set out the facts concerning Camille's mental health issues and OCS's efforts to provide Camille treatment. Camille testified at trial that anxiety was her only current mental health issue and that she was taking prescribed

---

[32] 25 U.S.C. § 1912(d) (2006).

[33] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

medication to treat her anxiety. Camille twice attempted suicide, at ages 14 and 15, and received treatment at that time. At the time of trial Camille was 35. Lundgren referred Camille to Southcentral for a mental health assessment and attempted to set up intake appointments for Camille.

Camille argues that her mental health issues may have been the "underlying cause" of her substance abuse, and that by ignoring her mental health needs, OCS failed to address the "root problem[]" which often "contribute[s] to people falling into the traps of alcoholism." Indeed, we have recognized the importance of providing dual-diagnosis treatment.[34] But in this case, there was no evidence that Camille in fact had a current mental health problem that rendered OCS's efforts insufficient. Although Camille testified about her anxiety and the treatment she received, she did not describe any possible relationship between that anxiety and her failure to address her substance abuse, and nothing she said permitted an inference that her anxiety prevented her from satisfying the OCS case plan. And there was no evidence of a current, more significant, mental health issue that had to be addressed.

This case is analogous to *Thomas H. v. State*, *Department of Health & Social Services, Office of Children's Services*, where a father's case plan included a requirement for substance abuse and mental health assessments and treatment.[35] Thomas eventually completed the substance abuse treatment, but OCS failed to provide him with

---

[34] "A dual diagnosis is given to a patient who has both mental illness and a substance abuse problem; a dual diagnosis program is designed to provide treatment addressing both problems." *Nicole H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1246, 2006 WL 895084, *3 at n.2 (Alaska, Apr. 5, 2006). *See N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001) (holding that because OCS placed a parent in a program which had "experience working with dual-diagnosis patients," active efforts were made to address the parent's dual-diagnosis needs).

[35] 184 P.3d 9, 11 (Alaska 2008).

a referral to obtain a mental health assessment.[36] Thomas challenged the superior court's active efforts findings, arguing that "while OCS identified the necessary services, it never made the requisite referrals for Thomas to obtain a mental health assessment."[37] After considering the "number of referrals from the [S]tate for services, including multiple substance abuse treatment programs and parenting classes," we rejected Thomas's argument that OCS's failure to provide a mental health referral "imposed a roadblock on subsequent termination proceedings."[38] We held that "OCS's failure here to provide a mental health referral to Thomas throughout the history of his case falls short of exemplary, but that the agency nonetheless satisfied the 'active efforts' requirement based upon its overall handling of the case."[39]

In comparison, OCS here actually made affirmative efforts to obtain a mental health assessment for Camille. OCS referred Camille to Southcentral, called Southcentral to set up an appointment, and reminded Camille to contact Southcentral. These efforts exceeded OCS's complete lack of mental health efforts in *Thomas H.*, where we nonetheless held that OCS's overall efforts were sufficient.[40] As noted above in Parts II.A.5 and 6, OCS made numerous efforts to get Camille substance abuse treatment, mental health assessments, parenting classes, visits with the children, housing, and family care court admittance.[41] As in *Thomas H.*, even if OCS could have done more

---

[36]   *Id.* at 12.

[37]   *Id.* at 16.

[38]   *Id.* at 17.

[39]   *Id.* at 16.

[40]   *Id.* at 16-17.

[41]   The superior court discussed the unwillingness of the parties to execute on

(continued...)

to get Camille mental health care, the superior court did not clearly err in finding active efforts when considering OCS's efforts in their entirety.

Second, Camille argues that OCS failed to assist her with housing and employment issues. The State counters that OCS referred Camille to Safe Harbor, but that the facility required sobriety to enter. We are unpersuaded by Camille's argument. OCS caseworkers discussed specific job openings with both parents, attempted to secure storage space to facilitate job interviews, and referred Camille to a shelter. These efforts, in addition to those described in Parts II.A.5 and 6, support the superior court's active efforts findings.

Third, Camille argues that OCS "sabotaged" her chance to obtain long-term treatment at Stepping Stones by refusing to commit to reunification within 30 days of admission, a condition of Camille's acceptance into the program. But, as the State argues, OCS was unable to commit to placing Joshua with Camille within 30 days of entering treatment because it was against Joshua's interests to leave a stable home to be placed with Camille when she had made "no headway" in becoming sober. The facts set out in Parts II.A.4 and 6.a demonstrate that the superior court did not commit clear error in finding that it would have been cruel to remove Joshua from foster placement "given the lack of any indication that [Camille] was serious about treatment." It was reasonable,

---

[41]     (...continued)
the case plan:

> Ellyn Lundgren, OCS caseworker, in general testified to active efforts that the department made in this case that's now two years old and is just mired in hopelessness and lack of progress. Because you can bring clients to water, [but] you can't make the clients drink; and these clients don't want to or are unable to work a case plan in a satisfactory way. They just can't, it's beyond them. The needs are too great. Their own conditions are too damaged, too tough.

not "sabotage," for OCS to be unwilling to commit to placing Joshua with Camille within 30 days of entering treatment.

Finally, Camille argues that OCS failed to fulfill its requirements under ICWA and state regulations to locate all living adult family members, and to place the children with Native families. The State responds that ICWA-compliant placement is irrelevant in termination proceedings. The State is correct. As we held recently in *David S. v. State, Department of Health & Social Services, Office of Children's Services*,[42] "ordinarily the question whether a placement decision complies with ICWA's placement preferences will not be germane to the elements of termination because nothing in ICWA requires a consideration of the ICWA placement preferences in the decision whether to terminate parental rights."[43] We concluded there that "[u]nder ICWA, then, a termination of parental rights may not be invalidated by showing a violation of the ICWA placement preferences."[44] The State also points out that OCS conducted a reasonable relative-placement search, but that no ICWA-compliant homes were available to meet the children's special needs. Camille's argument is identical to the contention Stephen made in his appeal. We there rejected his contention:

> Stephen's argument that OCS failed to properly locate ICWA-compliant placements for the children also fails. First, OCS did identify both Stephen and Camille's parents as supportive, but they were unable or unwilling to care for the children. Second, the children's special needs made it difficult to place the children in an ICWA-compliant home. Notably, the children's tribe approved of the placement.

---

[42]    270 P.3d 767 (Alaska 2012).

[43]    *Id.* at 779.

[44]    *Id.*

Finally, Joshua was placed with a relative, but that [placement] failed due to Camille's behavior.[45]

Camille points to no additional facts that would lead us to a different result.

In summary, we hold that it was not clear error for the superior court to find that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts proved unsuccessful. Accordingly, we affirm the court's legal conclusion that active efforts were made.

## C. The Superior Court Did Not Err In Concluding That If Either Boy Were Returned To His Mother's Care, He Would Likely Suffer Serious Harm.

Under ICWA in order to terminate a parent's rights to an Indian child, a court must find by evidence beyond a reasonable doubt that the child would suffer "serious physical or emotional damage" if returned to the parent.[46] This finding must be supported by expert testimony.[47] "Proof that a parent's custody is likely to cause a child serious harm requires proof that (1) the parent's conduct is likely to harm the children and (2) the parent's conduct is unlikely to change."[48]

Camille argues that experts did not provide testimony about the "care and prospects of either child individually with respect[] to each parent" and that mere

---

[45] *Stephen H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1400, 2011 WL 6004352, at *7 (Alaska, Nov. 30, 2011) (internal citation omitted).

[46] *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1019-20 (Alaska 2009).

[47] *Id*.

[48] *Id*. (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000)).

evidence of a parent's substance abuse or a child's developmental abilities does not meet the ICWA burden. She argues that she had a strong bond with Joshua, and that there was no evidence of "any actual harm" to him. The State responds that the trial court heard testimony by several expert and lay witnesses addressing Camille's substance abuse problem. The State next argues that Stephen lacked the ability to internalize his substance abuse treatment. The State finally argues that the children required significant care to remain healthy. The State concludes that this was sufficient evidence to support the trial court's findings.

> In its oral findings, the superior court reasoned:

> [T]he expert testimony in this case did not explicitly focus on the harm that alcoholic parents cause children beyond the sort of common-sense notion that kids are physically at risk if you have debilitated or drunk parents. . . . [I]f either or both of these children were now taken from their two bonded placements and placed in the care of people who are not coherent emotional, physical, intellectual personalities right now, who need the time and the space to just take care of themselves, to heal themselves before they try to care for other little human beings in this world . . . it's beyond a reasonable doubt that the younger boy, [Derrick], would suffer physical damage because his health would degrade, and he would suffer emotional damage because his environment would degrade. And the same goes for [Joshua], who is quite profoundly impaired mentally, therefore at extraordinarily enhanced risk for emotional development from his environment [and] his peers. . . . And the testimony of the treatment providers that these folks are right smack in the middle of profound alcoholism, unresolved.

The record supports these findings. We addressed the father's equivalent argument in *Stephen H.*[49] There we rejected the father's argument that the boys would not be harmed if returned to his care:

> First, Derrick's doctor, a qualified expert, and his foster mother testified regarding his serious medical needs and the daily challenges of providing care. A non-sober caregiver could pose a substantial risk not only of serious harm but of survival. While Joshua's needs are less complicated, they remain outside of the ordinary. His brain dysfunction requires stability and supervision to ensure he is able to perform daily tasks. Second, there is evidence of actual harm to the children. Both children required significant care upon removal from the home.[50]

Derrick's foster mother testified regarding the danger faced by Derrick if a parent were intoxicated:

> Q: And so if a parent or a care provider was intoxicated or not [at] full capacity to take care of him, could you see that working out for [Derrick]?
>
> A: No. [Derrick] could easily get hurt. . . . He's got brittle bones. . . . [H]e's totally dependent on us to give him medication, to give him his food, to make sure he has enough fluid in his body so he doesn't get dehydrated. If a person was impaired, he wouldn't — he wouldn't get that.

---

[49]     Stephen argued that only one expert witness testified regarding his conduct and that "the lack of evidence supporting any previously inflicted harm whatsoever undercuts the prospective likelihood of serious [harm]." *Stephen H.*, 2011 WL 6004352, at *8. He characterized the expert's testimony as "positive," meaning favorable to Stephen, and cited his special bond with Derrick and desire to care for his children to support his assertion that there was no proof beyond a reasonable doubt that harm would likely result if the children were returned to his care. *Id.*

[50]     *Id.*

-24-                                                          *1419*

In Part II.A.3 we explained that Camille suffers from unremedied alcohol abuse problems, which her substance abuse counselor observed had a "significant impact" on her independent functioning. Based on this record, we hold that it was not clearly erroneous to find by evidence beyond a reasonable doubt that Camille's conduct would likely harm the children and that Camille's conduct was unlikely to change. Given the court's factual findings we hold that the superior court did not legally err.

**D.**     **The Superior Court Did Not Clearly Err In Finding That It Was In The Children's Best Interests For Their Mother's Parental Rights To Be Terminated.**

The trial court must consider the best interests of the child before terminating parental rights.[51] One factor the court may consider in determining best interests is the child's need for stability.[52] The superior court found that because of Camille and Stephen's substance abuse, their children's specialized needs, and the foster parents' ability to meet those needs, termination was in the children's best interests.

Camille asserts that the superior court order did not provide "true insight" into its best interests findings, and "simply stated that it was in [the children's] best interests without further detail." She argues that the superior court failed to consider her bond with Joshua, and the boys' loss of contact with each other and their family.

The State concedes that there was evidence of a special bond between the children and their parents, but argues that there was also evidence that Camille's unremedied alcohol abuse prevented her from providing the boys with a "safe life and sober caretak[er]." The State asserts that the children had developed a bond with their

---

[51]     *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1119 (Alaska 2010).

[52]     *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 936-37 (Alaska 2004).

foster parents, the foster parents were meeting the children's special needs, and the foster parents hoped to adopt the children. The State argues that Joshua's foster family expressed a willingness to continue Joshua's relationship with his brother, parents, and their tribe. The State contends that there was no evidence Derrick's foster mother would be unwilling to allow contact between Derrick and his biological family and tribe. Finally, the State asserts that "the tribe supported the boys' placements with their foster parents . . . throughout the case."

Stephen made a similar argument on appeal, contending "that the superior court failed to consider his special bond with Derrick, his desire to care for the children, and the possibility that termination will sever the relationship between the brothers and their tribe."[53] As we reasoned in *Stephen H.*, even if the evidence suggests some special bond between the children and their parents, Derrick and Joshua's extreme vulnerabilities and resulting special needs would best be "served by consistent, qualified," and sober care.[54] The facts we discussed above in Parts II.A.3-6.a demonstrate Camille's inability to manage her substance abuse. The police forwarded the case to OCS after finding the parents intoxicated while the children were in their care. OCS removed the children from Camille's home because she continued to drink. Camille missed several visits with her children because she was intoxicated. Camille completed a substance abuse assessment, but failed to follow its recommendations, and the Community Service Patrol repeatedly picked her up for public intoxication. Camille then participated in a detoxification program and residential treatment program, but relapsed. Clitheroe conducted another substance abuse assessment of Camille; it

---

[53]     *Stephen H.*, 2011 WL 6004352, at *8 (Alaska, Nov. 30, 2011).

[54]     *Id.*

recommended she enter long-term residential treatment, but she had not done so by the time of trial. Further, as we observed in *Stephen H.*:

> The children have been in their foster homes for over two years. The foster parents desire to adopt the children and are able to provide the necessary care, including continuing the children's relationship with the tribe. Additionally, the lack of visits between the boys is attributed to scheduling conflicts, not a disregard of the importance of the sibling relationship. There is ample evidence that it is in the children's best interests that the court terminate Stephen's parental rights.[55]

We conclude that the same "ample evidence" regarding the children's needs, in addition to the evidence of Camille's continued substance abuse, establishes that the superior court did not clearly err in finding that it was in the children's best interests to terminate Camille's parental rights.

## V.  CONCLUSION

We AFFIRM the superior court's order terminating Camille's parental rights and responsibilities.

---

[55]  *Id.*