*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| THEA G., | ) | |
| | ) | Supreme Court No. S-14663 |
| Appellant, | ) | |
| | ) | Superior Court Nos. |
| v. | ) | 3PA-09-00048/00049 CN |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 6742 – January 9, 2013 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Marjorie K. Allard, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Megan R. Webb, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee. Mara Rabinowitz, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Guardian ad Litem. Native Village of Kotzebue, through its ICWA Representative, Clara Henry.

Before: Fabe, Chief Justice, Carpeneti and Stowers, Justices. [Winfree and Maassen, Justices, not participating.]

FABE, Chief Justice.
CARPENETI, Justice, dissenting.

## I. INTRODUCTION

Thea G. challenges the superior court's order terminating her parental rights to her two children, Zach, age 12, and Abbie, age six.[1] The superior court terminated Thea's parental rights based on her unremedied substance abuse issues. Thea raises three issues on appeal: First, she challenges the superior court's finding that the Office of Children's Services (OCS) made active efforts to prevent the breakup of her family. Second, she challenges the finding that if her custody over Zach and Abbie were continued the children would likely suffer serious emotional or physical damage. Finally, she challenges the finding that termination of her parental rights is in Zach's and Abbie's best interests. Because each of these findings is supported by sufficient evidence, we affirm the superior court's order terminating Thea's parental rights to Zach and Abbie.

## II. FACTS

Thea and her husband, Samuel, had two children, Zach, born in 1999, and Abbie, born in 2005. Thea is a member of the Native Village of Kotzebue (the Tribe) and her children are eligible for membership, so the children are Indian children for purposes of the Indian Child Welfare Act[2] (ICWA).

Thea has struggled with substance abuse and domestic violence since at least 2003.[3] In an incident that year, Thea, while intoxicated, physically assaulted her mother and sister in a struggle over the mother's medication. Zach was present during

---

[1] Pseudonyms are used throughout to protect the privacy of the parties.

[2] 25 U.S.C. §§ 1901-1963 (2006).

[3] Thea testified that she was raised in an alcoholic family and began drinking as a teenager, but that her drinking problems worsened after Zach was born. In addition to alcohol, her self-reported history of prescribed and non-prescribed drug use includes cocaine, marijuana, opioids, sedatives, and tranquilizers.

the scuffle. While being arrested, Thea kicked a corrections officer in the groin. Thea was convicted on two counts of domestic violence assault. In other, unrelated, incidents that year, Thea was convicted of assault and disorderly conduct.[4] Since that time, Thea has demonstrated a pattern of abusing substances — typically alcohol — resulting in run-ins with law enforcement, followed by attempts at treatment and periods of sobriety, and then, invariably, a relapse and descent into substance abuse again.

In July 2004, while Thea was pregnant with Abbie, Zach was taken into OCS's custody. OCS's concerns included the family's inadequate housing, Thea and Samuel's substance abuse, and repeated incidents of domestic violence between the couple in Zach's presence. OCS developed a case plan recommending that Thea participate in substance abuse treatment, a domestic violence assessment, and parenting classes. Thea completed a 35-day residential treatment program at Old Minto Family Recovery Camp. OCS returned Zach to his parents' physical care after about a month but retained legal custody for a year. After completing treatment, Thea remained sober for 18 months, but in January 2006 she relapsed and was arrested for driving while intoxicated on alcohol and Valium with Zach and Abbie in her car. She was convicted of DUI and resisting arrest.

Samuel died of natural causes in September 2008, and, following his death, Thea's substance abuse escalated dramatically. She testified that she began abusing alcohol to the extent that her parenting was "terrible," and she was often intoxicated while caring for her children.

On May 8, 2009, Thea called the state troopers to report that Zach and Abbie had been missing from her home for hours. According to the emergency

---

[4] At the termination trial, Thea testified that she had been arrested multiple times for domestic violence and that each incident involved alcohol or drugs.

adjudication petition, the trooper who responded to her call found Thea to be "highly intoxicated" and unable to care for her children. Thea later admitted that she had been "caring for her children in an intoxicated state without a sober caretaker" and that she was "unaware for a significant period of time" that the children were not in the home. Because of Thea's history of substance abuse, OCS took Zach and Abbie into its custody. The agency placed the children with Thea's neighbors, the Newtons. OCS developed a case plan for the family; the plan required Thea to participate in substance abuse treatment and urine analyses (UAs), refrain from misusing prescription and over-the-counter medications, complete parenting classes, and participate in counseling. The plan provided liberal opportunities for Thea to have contact with the children.

Within a month of the children's removal, Thea was involved in a single-car accident that resulted in another DUI conviction. Several days later, Thea was remanded into custody for alcohol screening, where her breath alcohol content registered .304.

In late June 2009, following a referral by OCS, Thea began substance abuse treatment at Akeela House. She did not actively participate in the program, however, and withdrew after only 12 days. Her discharge report recommended that she receive mental health counseling and long-term treatment for mood-altering substances.

For several weeks after Thea left Akeela House, she remained sober, she visited her children daily at the Newtons' home, and she applied for admission to treatment at Salvation Army Clitheroe Center. But before Thea entered that program, she relapsed again.

By the close of 2009, Thea was once again sober. She attended AA meetings, had a sober support system in place, participated in outpatient treatment at Alaska Family Services (AFS), and worked with OCS to gain admission to a residential treatment program at Southcentral Foundation Dena A Coy. As a result, on

December 10, 2009, OCS placed Zach and Abbie with Thea for a trial home visit. In disposition reports filed with the court in January 2010, Thea's social worker and the children's guardian ad litem praised Thea's performance leading up to and during the trial visit. But the trial visit ended later that month because Thea again relapsed. The children were returned to the Newtons' home.

By spring 2010, Thea was again drinking heavily. In early March 2010, she was incarcerated on a DUI charge and underwent alcohol detoxification treatment. At the time, she reported that she was drinking half a bottle of vodka daily.

The following month, Thea began a four-month residential treatment program at Dena A Coy, on referral by OCS. She successfully completed the program in August 2010, and she was discharged with a recommendation for participation in intensive outpatient care and attendance at AA/NA meetings. She was also referred to AFS for continued substance abuse and mental health counseling. She participated in the AFS program for a few months but did not complete it.

In the fall of 2010, Thea and the Newtons asked OCS to place the children with Thea again for another trial home visit. Thea's social worker, Fennisha Gardner, denied the request, stating that Thea was not ready for such a visit and that she did not want to set Thea up for failure. Despite OCS's denial of the request, Thea and the Newtons defied OCS and transferred the children to Thea, after which the Newtons left town for a number of weeks.

On November 3, 2010, Thea was arrested for driving while intoxicated on alcohol and Xanax with Zach and Abbie in her car. She pleaded guilty to felony DUI and endangering the welfare of a minor and was sentenced to 34 months incarceration with 31 months suspended. She received four years of felony probation, forfeited her car, permanently lost her driver's license, was fined $10,000 with $7,500 suspended, and was ordered to participate in and graduate from mental health court. The children were

not placed back with the Newtons; instead, they were placed with Thea's sister and her husband.

As a result of her conviction, the mental health court referred Thea to treatment at Set Free Alaska, where she was assessed on March 28, 2011. During the assessment, she repeatedly "attempted to convince staff she did not need to go to [r]esidential [t]reatment and minimized issues." Thea denied having problems with alcohol or drug use, and she assessed her risk of relapse as low. The assessor, however, diagnosed Thea as being dependent on alcohol, sedatives, and cocaine. She categorized Thea as being in the "precontemplation" stage of treatment, assessed Thea's relapse potential as high, and categorized her motivation to participate in treatment as 100% external. The assessor recommended that Thea participate in high-intensity residential treatment.

While awaiting admission to a residential treatment program, Thea was scheduled to begin outpatient treatment at Set Free Alaska on April 21, 2011. But a few days before her treatment was to begin, Thea was hospitalized for suicidal ideation. Her blood alcohol level at the time exceeded .250. Upon her release from the hospital, Thea began the outpatient treatment program, but she missed appointments from mid-May through mid-June due to yet another arrest, this time for driving with a revoked license, without insurance, and for avoiding an ignition interlock device. On August 8, 2011, Thea was discharged from Set Free Alaska for violating the program's rules. Her discharge summary graded her progress as "unsatisfactory" and referred her to residential treatment. Late in September 2011, after the termination trial had begun, Thea began residential treatment at Clitheroe Center. The program was to last 90 days, following which Thea would be required to complete an aftercare program. At the time, Thea admitted to having "a problem with alcohol and drugs," but she denied needing

residential treatment. She stated that she had entered the residential program at Clitheroe in part because it was required by the terms of her felony probation.

## III.   PROCEEDINGS

In March 2011, OCS filed a petition to terminate Thea's parental rights. Trial was held during two days in September and October 2011. Thea testified, as did her social worker and her counselor from Set Free Alaska. In addition, OCS supervisor Karen Morrison testified as an expert regarding the risks of placing children with parents who have substance abuse problems and the effects on children of delayed permanency. The Tribe, which had intervened in the proceeding early on, participated in the termination trial through its non-attorney tribal representative, Clara Henry. Following the trial, the superior court terminated Thea's parental rights to Zach and Abbie.

Thea appeals the termination order. She contests the superior court's findings that OCS made active efforts to preserve her family, that her continued custody of the children would likely result in their suffering serious emotional or physical harm, and that termination of her parental rights is in the children's best interests.

## IV.   STANDARD OF REVIEW

A trial court's determination that OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family presents a mixed question of fact and law.[5] We review factual findings under the "clearly erroneous" standard[6] and conclusions of law — such

---

[5]       *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010) (citing *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1186 (Alaska 2009)).

[6]       *Id.* (citing *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009)).

as whether the trial court's findings satisfy the requirements of ICWA — de novo.[7] Findings are clearly erroneous "if a review of the entire record in the light most favorable to the party prevailing below leaves us with a definite and firm conviction that a mistake has been made."[8]

A trial court's determination that a parent's continued custody of a youth will likely result in the child suffering serious emotional or physical damage is a factual finding that we review for clear error.[9]

A trial court's decision to admit expert testimony is reviewed for an abuse of discretion.[10] We will find that the trial court abused its discretion if, after reviewing the record as a whole, we are left with a definite and firm conviction that the trial court erred.[11] Whether expert testimony presented at trial satisfies the requirements of ICWA is a legal question that we review de novo.[12]

---

[7] *Id.* (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

[8] *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000) (internal quotation marks and citation omitted)).

[9] *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011) (citing *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[10] *Barbara P.*, 234 P.3d at 1253 (citing *Lynden, Inc. v. Walker*, 30 P.3d 609, 612 (Alaska 2001)).

[11] *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 71 P.3d 811 (Alaska 2003) (quoting *Peter Pan Seafoods, Inc. v. Stepanoff*, 650 P.2d 375, 378-79 (Alaska 1982) (internal quotation marks omitted)).

[12] *Lucy J.*, 244 P.3d at 1111 (citing *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

A trial court's determination that termination of parental rights is in a child's best interests is a factual finding that we review for clear error.[13]

## V.    DISCUSSION

### A.    The Superior Court Did Not Err In Determining That OCS Made Active But Unsuccessful Efforts To Provide Services And Programs To Prevent The Breakup Of The Family.

Thea argues that the superior court erred in finding that OCS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of her family, as required by ICWA.[14]  She does not discuss the court's finding or the evidence supporting it; instead she argues that the court erred by entering its finding without taking into account assertions made by the Tribe in its closing argument.[15]

Thea's argument fails for several reasons.  First, her argument is unpersuasive because it does not address the trial court's finding or the evidence supporting it.  The record provides abundant support for the trial court's finding that OCS provided Thea and her family with active reunification efforts.  These efforts consisted of multiple case plans; multiple referrals for substance abuse evaluations and support for treatment programs; multiple referrals for mental health evaluations and

---

[13]    *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011) (citing *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850 (Alaska 2009)).

[14]    25 U.S.C. § 1912(d) (2006).

[15]    The Tribe joins Thea's brief on appeal, specifically as to this issue.

counseling; medical, dental, and mental health services for the children; regular family contact between Thea and the children; and a trial home visit.[16]

Thea seems to argue that despite the evidence demonstrating that OCS provided these numerous services over the years that this case was pending, the trial court could not properly have found OCS's reunification efforts to be adequate without addressing certain claims made by the Tribe in its closing argument. But Thea is incorrect in light of an examination of the Tribe's arguments.

The Tribe's first claim was that, early in the case, OCS delayed in holding a placement decision meeting and in obtaining paternity testing. The Tribe asserted that by these actions OCS hindered the Tribe's ability to advocate for the children to be placed with paternal relatives. But even if the Tribe's assertions were accurate, this argument goes to placement, not reunification efforts. Our caselaw establishes that placement is a separate issue from active efforts, and that the two issues must be analyzed separately.[17] The exception to that rule — under which a placement decision

_____

[16]     The superior court considered efforts made on Thea's behalf by the Department of Corrections and the mental health court, as well as those made by OCS. This is consistent with the language of ICWA, which does not specify that any particular entity must make active efforts, *see* 25 U.S.C. § 1912(d) (requiring a showing that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family"), and with our prior decisions. *See, e.g.*, *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 765 (Alaska 2009) (efforts made by a parent's parole officers count as active efforts for purposes of ICWA); *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 56 (Alaska 2003) ("While [a parent] is in prison, the Department of Corrections rather than [OCS] has primary responsibility for providing services to him[.]").

[17]     *See, e.g.*, *Roy S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 278 P.3d 886, 891 (Alaska 2012) ("[F]ailure to follow ICWA's placement preferences cannot provide a basis for determining that OCS failed to undertake active

(continued...)

may be relevant to an active efforts analysis — applies when a child's placement directly impacts a parent's ability to participate in remedial efforts.[18] That exception is not implicated here. Indeed, in this case OCS placed the children with the Newtons at Thea's request so that the family could remain close, in order to support family contact, which was a core element of Thea's case plan.[19]

The Tribe also claimed that OCS's efforts were flawed because the agency delayed in obtaining mental health services for the children. But the record does not support this allegation. Instead, the record reflects that the children received appropriate mental health services throughout the duration of the proceedings.

Finally, Thea's argument fails because her allegation that the trial court ignored the Tribe's closing argument is rebutted by the court's statements on the record that "[t]he parties at trial included . . . the Native Village of Kotzebue," and "the parties submitted closing argument briefing . . . and the Court has reviewed all those arguments."[20] The trial court did not err in finding that OCS provided Thea with active efforts to prevent the breakup of her family.

---

[17](...continued) efforts."); *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 780 (Alaska 2012) ("[P]lacement decisions present a separate analytical question from termination decisions.").

[18] *David S.*, 270 P.3d at 779.

[19] The superior court approved the non-relative placement, finding that OCS's objective constituted good cause to deviate from ICWA's placement preferences.

[20] Thea provides no legal authority to support her implied assertion that the trial court must individually address every assertion made by a party in a closing argument, and we have never required the trial court to do so.

**B.**   **The Superior Court Did Not Err In Finding That Thea's Continued Custody Would Likely Result In The Children Suffering Serious Emotional Or Physical Harm.**

Thea argues that the superior court erred in finding that the children would likely suffer serious emotional or physical damage if returned to her care. She raises two challenges to the finding, which, by the terms of ICWA, must be supported by evidence beyond a reasonable doubt, including the testimony of one or more qualified expert witnesses.[21] First, Thea argues that OCS supervisor Karen Morrison was not qualified to testify as an ICWA expert because (1) Morrison was not an expert in Native culture, and (2) as an employee of OCS, Morrison was unable to testify neutrally. Second, Thea argues that even if Morrison satisfied the qualifications to testify as an ICWA expert, her testimony was flawed because it was based solely on her review of the OCS file and the trial exhibits and was not sufficiently specific to this case.

**1.**   **The superior court did not abuse its discretion in qualifying Karen Morrison to testify as an expert witness for purposes of ICWA.**

**a.**   **Morrison's lack of expertise in cultural matters did not preclude her from testifying as an ICWA expert.**

ICWA requires that before a court may terminate parental rights, the court must find "beyond a reasonable doubt . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[22] The finding, which must be supported by expert testimony, requires proof that the parent's conduct is unlikely to change and will likely cause serious harm to the

---

[21]   25 U.S.C. § 1912(f) (2006).

[22]   *Id.*

child in the future.[23]  These elements may be proved through the testimony of one or more expert witnesses, or by aggregating the testimony of lay and expert witnesses.[24]

The strict standard of proof required for this finding reflects Congress's goal to prevent the breakup of Native families "solely on the basis of testimony from social workers who lack[] the familiarity with Native culture necessary to distinguish between 'the cultural and social standards prevailing in Indian communities and families' and actual abuse or neglect."[25]  A witness may be qualified to testify as an expert under ICWA based on the witness's personal experiences or professional expertise in Native culture.[26]  But:

> When the basis for termination is unrelated to Native culture and society and when any lack of familiarity with cultural mores will not influence the termination decision or implicate cultural bias in the termination proceeding, the qualifications of an expert testifying under § 1912(f) need not include familiarity with Native culture.[27]

In the present case, OCS supervisor Morrison was qualified to testify as an expert without a showing that she was an expert in Native culture.  Instead, her expertise was in the effects of substance abuse on families and the effects of delayed permanency

---

[23]    *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 503 (Alaska 2009) (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000)).

[24]    *L.G.*, 14 P.3d at 950 (Alaska 2000).

[25]    *Id.* at 951 (citation omitted) (quoting 25 U.S.C. § 1901(5)).

[26]    *Id.* at 951-52.

[27]    *Marcia V.*, 201 P.3d at 503.

on children.[28]  Our decisions indicate that, in general, cases involving issues of parental substance abuse do not implicate cultural mores.[29]  Thea does not argue that her case is different, and she points to nothing to suggest that cultural issues or cultural bias played a role in OCS's actions, in expert witness Morrison's testimony, or in the superior court's decision to terminate her rights.  The superior court thus properly allowed Morrison to testify as an expert despite her lack of expertise in Alaska Native culture.

> **b.  Thea has waived her argument that Morrison was disqualified from testifying as an ICWA expert because of her status as an employee of OCS.**

Thea's brief contains a single sentence alleging that Morrison should have been precluded from testifying as an ICWA expert because, as an OCS employee, she "lacked the impartiality and outside neutrality that the ICWA expert is supposed to provide."  Thea points to nothing in the record, nor does she cite any legal authority, to support this allegation.[30]  As such, Thea's argument is inadequately briefed and thus is

---

[28]  Thea does not challenge Morrison's expertise in the specified areas, so we do not review her qualifications to testify as an expert on those topics.

[29]  *See, e.g.*, *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1111 (Alaska 2011); *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1118 (Alaska 2010); *Marcia V.*, 201 P.3d at 503; *L.G.*, 14 P.3d at 953-54.

[30]  In support of her allegation, Thea cites an online publication of the Native American Rights Fund.  That publication contains a "Practice Tip" discouraging the use of an employee of an agency seeking termination of parental rights as an expert witness for ICWA purposes, but the practice tip explicitly concedes that using such an employee as an ICWA expert is "*not prohibited by the ICWA*."  NATIVE AM. RIGHTS FUND, A PRACTICAL GUIDE TO THE INDIAN CHILD WELFARE ACT (online ed. rev. Sept. 2011) Practice Tip at Topic 14, Expert Witnesses, Question 14.7, http://narf.org/icwa/faq/expert.htm#Q7 (emphasis added).

deemed waived.[31]

## 2. The superior court's finding that the children would suffer harm if returned to Thea's custody was supported by sufficient evidence.

Thea argues that the superior court's finding that her continued custody would likely result in serious harm befalling the children was not supported by sufficient evidence. She limits her argument to complaints about Morrison's expert testimony, averring specifically that the testimony was defective because (1) Morrison based her testimony on a review of the OCS file and trial exhibits, having had no personal interactions with Thea or the children, and (2) Morrison's testimony was "overly generalized" and not grounded in the specific facts and issues of this case. Both arguments are based on this court's decision in *C.J. v. State, Department of Health & Social Services*[32] and its companion case, *J.J. v. State, Department of Health & Social Services, Division of Family & Youth Services*.[33] Neither argument has merit.

As to the first argument, it is well settled that an ICWA expert may testify based on a review of documents in the record, without having had any personal contact with the parties, as long as the witness's testimony is grounded in the facts and issues specific to the case before the court.[34] Thea's argument is based on an erroneous interpretation of our decisions in *C.J.* and *J.J.* and is an argument that we have repeatedly

---

[31] *See Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 719 n.14 (Alaska 2003) (citing *Martinson v. ARCO Alaska, Inc.*, 989 P.3d 733, 737 (Alaska 1999)).

[32] 18 P.3d 1214 (Alaska 2001).

[33] 38 P.3d 7 (Alaska 2001).

[34] *See, e.g.*, *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1192 (Alaska 2009); *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1020 (Alaska 2009).

rejected in the past.[35]

As to the second argument, the expert's testimony in this case was grounded in the specific facts and issues facing this family. Witnesses other than Morrison established that Thea struggled with a longstanding alcohol abuse problem that was sometimes coupled with domestic violence; that she was locked in a repetitive cycle of abusing substances, participating in treatment, experiencing a period of sobriety, and relapsing; that she had twice been convicted of driving while intoxicated with her children in her car; and that her potential for future relapses into abusive behaviors was high. Thea does not challenge this testimony.

Morrison then testified that children living with a parent who exhibited this conduct were at risk of harm. She testified that such a lifestyle is particularly alarming for children who are present when their parent is arrested for DUI or who witness the parent's involvement in domestic violence, both of which occurred in this case. She noted that issues facing children who live with such parents include not "know[ing] when their mom's going to be sober, if the mom's going to be able to take care of them, if they're going to be safe, if mom's going to make sure they have all their needs met." In addition, because parents who are in denial about an unsafe situation are unlikely to protect their children from the dangers it poses, Morrison expressed particular concern about Thea's recent statement that she did not require treatment. In summary, Morrison testified that given this family's history, if Zach and Abbie were returned to Thea's care, they would be likely to suffer serious emotional or physical harm.

In reviewing a trial court's finding that a parent's continued custody poses a future risk of harm to a child, we are mindful that "ICWA does not require that the

---

[35] *E.g.*, *Ben M.*, 204 P.3d at 1020; *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 507 (Alaska 2009); *J.A. v. State, DFYS*, 50 P.3d 395, 401 (Alaska 2002).

experts' testimony provide the sole basis for the court's conclusion; ICWA simply requires that the testimony support that conclusion."[36] Regarding expert testimony in particular, "the issues are whether the expert disregarded or was unaware of contrary evidence, and whether the testimony was so vague and generalized that the trial court clearly erred in according weight to it."[37] Thea points to no evidence to contradict the lay testimony establishing her ongoing substance abuse and her relapse potential, and her conclusory statement that Morrison's testimony was "overly generalized" is not supported by the record. Aggregating the testimony of all the witnesses, substantial evidence demonstrated beyond a reasonable doubt that Thea's pattern of substance abuse was unlikely to change, and that those behaviors would place a child in Thea's custody at serious risk of physical or emotional damage. Thus, the superior court did not err in finding, beyond a reasonable doubt, that Zach and Abbie would likely suffer serious physical or emotional damage if Thea were to retain custody of them.

### C. The Superior Court Did Not Err In Finding That Termination Of Thea's Parental Rights Was In Zach's And Abbie's Best Interests.

Alaska Statute 47.10.088(c) requires that a court considering whether to terminate a parent's parental rights must "consider the best interests of the child." Alaska Child in Need of Aid Rule 18(c)(3) provides that before a court may terminate a parent's rights, the court must find "by a preponderance of the evidence that termination of parental rights is in the best interests of the child." Neither the statute nor the rule defines best interests, but guidance is found in AS 47.10.088(b), which lists five factors "relating to the best interests of the child" that a court may evaluate in determining whether a parent has timely remedied conduct or conditions that endanger

---

[36] *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 992 (Alaska 2002).

[37] *Ben M.*, 204 P.3d at 1020.

a child.[38]  The factors are not exclusive, nor is consideration of each factor mandatory. In addition, we have noted that the "best interests" finding required by AS 47.10.088(c) and CINA Rule 18(c)(3) requires a more comprehensive judgment than does determining whether the parent has timely remedied endangering conduct or conditions.[39] Nevertheless, in an appropriate case, the factors listed in AS 47.10.088(b) provide a logical beginning for a trial court's consideration of best interests under AS 47.10.088(c).

Here, the trial court addressed each of the listed factors.  First, given Thea's history, the court found little likelihood that the children could be returned to her care "within a reasonable time based on their age and need."[40]  Second, the court found that although Thea had participated in substance abuse treatment programs multiple times

---

[38]  AS 47.10.088(b) provides:

In making a determination under (a)(2) of this section, the court may consider any fact relating to the best interests of the child, including

(1)    the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2)    the amount of effort by the parent to remedy the conduct or the conditions in the home;

(3)    the harm caused to the child;

(4)    the likelihood that the harmful conduct will continue; and

(5)    the history of conduct by or conditions created by the parent.

[39]  *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 186 (Alaska 2008).

[40]  In making this determination, the court took into account that the treatment program Thea began during the trial would require 90 days of residential treatment, followed by nine months of aftercare.

over the course of the case, her motivation was "simply to make the Court happy." She disagreed with the recommendations of her current treatment provider, her probation officer, and OCS that she required residential treatment, and she was in denial about the period of sobriety she had demonstrated leading up to the termination trial. Third, the court found that Thea's behaviors had harmed the children by causing them trauma, subjecting them to removal from their home three different times, requiring them to experience their mother's incarceration, experiencing physical danger at the hands of an intoxicated driver, and, at least as to Zach, being exposed to domestic violence. Fourth, the court analyzed Thea's history and found that Thea had neither remedied, nor made significant progress in remedying, her substance abuse addiction and that given her history, "there [was] a . . . strong likelihood that this harmful conduct [would] continue." Finally, the superior court recounted in detail Thea's history of harmful conduct.

We have held that "a superior court may consider 'any fact relating to the best interests of the child' in its best-interests analysis,"[41] and that the superior court need not accord a particular weight to any given factor.[42] The superior court's analysis in this case conformed to this approach. The court did not stop its analysis with the AS 47.10.088(b) factors but went on to note that Zach and Abbie, who had been traumatized and were in need of trusting relationships, were presently living with Thea's sister and her husband in a safe and protective preadoptive relationship. The court observed that the children were reported to be doing well in this home. The court noted

---

[41] *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 932 (Alaska 2012) (quoting *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1025 (Alaska 2012)).

[42] *Id.* at 933 (quoting *Doe*, 272 P.3d at 1025).

that the children had been in OCS's custody for 29 months, a significant portion of their lives, and that further delays in permanency would cause them additional trauma.[43]

The superior court also considered Thea's conduct, noting that even though she understood that OCS would not tolerate her abuse of substances around her children, she physically endangered the children by driving intoxicated with them in her car. The court noted that not only had Thea failed to remedy her substance abuse behavior but she had made no significant progress toward that end and had demonstrated that she was not inclined to change those behaviors. The superior court observed that Thea's ongoing abusive behaviors were likely to result in the children suffering serious emotional or physical damage.

This case resembles *J.H. v. State, Department of Health & Social Services*,[44] in which we affirmed the superior court's best interests finding based on evidence that the mother had repeatedly returned to using drugs following her unsuccessful attempts at treatment. In *J.H.*, the mother, like Thea, "remained at high risk of returning to substance abuse."[45] There, we noted that there was "little doubt that a relapse by [the mother] would have placed [the child] at risk had she been returned to her mother's

---

[43]     Additional support for the trial court's finding is provided by social worker Gardner's testimony that "the children are in dire need of permanency . . . . They should just be happy and peaceful and know a stable lifestyle. Have to worry about little kid problems like studying and stuff instead of where is my mom, is she in jail or is she relapsed," and by expert witness Morrison's testimony that the children would be at risk if they did not quickly achieve permanency, because they had been unsettled for so much of their lives, and "when you're unsettled and you don't know where you're going to be, you don't know if you're going back, you don't know if you're going to stay, you don't know who your parents are going to be and who's going to take care of you, that's a pretty scary situation to be in."

[44]     30 P.3d 79, 87 (Alaska 2001).

[45]     *Id.*

home."[46] And in *Hannah B.*, we recognized that a child's need for permanence and stability should not be sacrificed indefinitely in order to allow the child's parents to rectify circumstances that placed their child in danger.[47]

The evidence presented to the superior court supported the court's finding that termination of Thea's parental rights, in order to free Zach and Abbie for adoption, was in the children's best interests. The superior court thus did not err in making that finding by a preponderance of the evidence.

The dissent argues that the superior court erred because additional evidence, not presented to the court, might have demonstrated that a permanency goal other than adoption — presumably a goal such as guardianship or placement with a fit and willing relative — would have better served the children's interests. The dissent is correct in noting that state and federal laws allow CINA cases to be resolved through permanency outcomes other than reunification or adoption.[48] But as we have held, the law does not require a court, in the context of a termination proceeding, to consider alternative outcomes, "except to the extent that the statute requires the court to order an arrangement that is in the child's best interest."[49]

Indeed, in *Dashiell R. v. State, Department of Health & Social Services, Office of Children's Services*,[50] we expressly rejected a father's argument that it was error to find that termination of his parental rights was in his children's best interests because

---

[46]    *Id.*

[47]    289 P.3d at 933 (quoting *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597 (Alaska 2010)).

[48]    *See, e.g.*, AS 47.05.065, .10.080(c) & (*l*); 42 U.S.C. § 675(5)(C) (2006).

[49]    *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 57 (Alaska 2001).

[50]    222 P.3d 841 (Alaska 2009).

the children would likely remain with their paternal grandparents even if the father's parental rights were terminated. We concluded that because the grandparents' custody would be temporary, the children would remain "under the cloud of continuing uncertainty, [and] the children's need for permanence and security would not be met."[51] Similarly, in *Hannah B.*, we rejected the mother's argument that the superior court's best interests finding was erroneous because the child was placed with his maternal grandmother, who supported reunification with the mother.[52] In affirming the superior court's best interests finding, we noted that it was "very uncertain whether Hannah would be able to assume responsibility for Jacob, given the significant amount of treatment remaining and her pattern of relapse following residential treatment."[53] Like Hannah, Thea has demonstrated a repeated pattern of relapse following treatment and, at a minimum, has a significant amount of treatment remaining before reunification could even be considered.

Thea asserts that in some cases a child's best interests require preserving rather than severing ties to an unfit parent. While such cases may exist, this is not one of them. Zach and Abbie have been in OCS's custody — in effect, in limbo — for nearly two and one-half years, waiting for Thea to act responsibly and step into her role as their parent. These children are not teenagers, on the verge of making their way in the world.[54] They are children who require the guidance and direction that is best provided

---

[51] *Id.* at 851.

[52] 289 P.3d at 933-34.

[53] *Id.* at 934.

[54] We note that while Zach was 12 years old at the time Thea's rights were terminated, he was only nine when Thea's conduct caused OCS to remove him from her care.

in a loving, stable family headed by functioning, trustworthy parents. After years of living in uncertainty, these children are finally in a position to be adopted into a permanent family with competent, stable parents, a resolution not available to them under any permanency goal other than adoption.[55] Preserving Thea's parental rights, in order to ensure maintenance of the children's ties to her, would continue to expose the children to Thea's potentially dangerous behaviors and would deprive them of the chance to become part of a permanent, stable family. As the superior court noted, trust is very important for children, as is a sense of permanency, and the lack of this trust and stability may be traumatic and may heighten the risk that a child will engage in antisocial behaviors.

The dissent argues that the superior court lacked pertinent information when it found that termination of Thea's parental rights was in her children's best interests. We appreciate the concern that the trial court did not hear about the children from their former or current caregivers or, more importantly, from their therapist. Such testimony, when available, is likely to result in a better-informed decision by a trial court called upon to decide whether to terminate a parent's rights. But here, the superior court based its decision on a preponderance of all of the evidence presented to it.[56] OCS

[55] Adoption requires termination of Thea's parental rights. *See* AS 25.23.130(a)(1); AS 47.10.088(a).

[56] The dissent claims that evidence in the record demonstrates that Zach and Abbie were "strongly" or "extremely" bonded to Thea "just before" the termination trial, and that Zach "continually" expressed a fervent desire that the family be kept together. Yet the evidence cited by the dissent consists primarily of a permanency report authored by the children's guardian ad litem nearly a year and a half before the termination trial was held. In her more recent report, authored six months before the trial, the guardian ad litem stated that while the children "remain bonded with their mother . . . [t]hey cannot continue to wait" for her to become ready to parent them. This report went on to

(continued...)

presented sufficient evidence to demonstrate that termination of Thea's rights would serve her children's best interests. Thea declined the opportunity to present any contrary evidence despite her current argument that such evidence was indispensable to the trial court's decision. We thus cannot conclude that based on the record before it, the trial court clearly erred in determining that termination of Thea's rights was in the best interests of Zach and Abbie.

Compelling evidence was presented to the trial court that continued custody of the children by Thea would likely result in serious emotional or physical damage befalling them. Evidence was also presented that termination of their parent's rights would provide the children with the opportunity to be welcomed into a permanent, stable family. Absent evidence to the contrary, termination of Thea's parental rights was in the best interests of the children. The trial court's finding is affirmed.

**D.    Thea's Remaining Arguments Are Without Merit.**

Thea's brief contains several arguments in addition to those addressed above. She argues that the superior court erred by failing to solicit, sua sponte, 12-year-old Zach's preferences regarding termination of Thea's rights or to appoint counsel to represent Zach in the termination proceedings. But these matters, which are properly within the superior court's discretion, were not raised in that court. Thea has not alleged or demonstrated that the superior court committed plain error on these matters, so these arguments are not properly before us.

---

[56](...continued)
recommend that Thea's parental rights be terminated, so that Zach and Abbie could be adopted. In reaching this recommendation, the report stressed that these children "need permanency. They need stability, consistency and to always be safe — they cannot worry if their mother is going to start drinking again and if they are going to be removed from her again."

Finally, Thea argues that the trial court erred in allowing the children's guardian ad litem, a non-attorney staff member of the state Office of Public Advocacy, to be "represented" by an OPA staff attorney during the termination proceedings. We reject this argument, noting that OPA, not a named individual, was appointed to act as the children's guardian ad litem in these proceedings. This is in accord with state law.[57] We have reviewed the record and have found no impropriety in the actions of either OPA representative.

## VI.   CONCLUSION

For the reasons discussed above, the decision of the superior court terminating Thea's parental rights to her children, Zach and Abbie, is AFFIRMED.

---

[57]    AS 25.24.310(c), 47.10.050(a).

CARPENETI, Justice, dissenting.

I disagree with today's opinion because the State provided the trial court with virtually no specific, particularized information concerning (1) the children who were before the court and (2) whether termination of their mother's parental rights was in their best interests. This failure left the court in an information vacuum which made it impossible for the court to make an informed decision about whether termination was in these children's best interests. I would therefore remand for the taking of evidence specific to Zach and Abbie's particularized situations, including the extent to which they have bonded with their mother, their current needs and developmental states, and (at least as to Zach) their preferences in the matter.

Zach and Abbie, the children before the court, lost their father to cancer in 2008. At the time of trial they were not infants but were children who had passed the age that, according to the legislature, is most critical to parental bonding.[1] Both children, and especially Zach, had already formed strong bonds with their mother. The guardian ad litem's Permanency Report of April 14, 2010 — about 17 months before the termination trial — said this about Zach's bonding with his mother:

> [Zach] is *very attached to his mother* and continues to do well with her close by — regular contact, interaction on a daily basis, her participation in his school and extracurricular activities, etc. With the loss of his father, *he has continually expressed his concern to the*

---

[1] In AS 47.05.065(5)(A) the legislature found that "children undergo a critical attachment process before the time they reach six years of age." Zach was 12 at the time of the trial, while Abbie was six.

-26-                                                                                        6742

*GAL that "my family" (himself, his mother and sister) all stay together.*

(Emphasis added.) The guardian ad litem's Disposition Report of January 2010 noted that the children had been placed with family friends who were very close neighbors and that this allowed the children to remain in close proximity to their mother. It noted that the children "need stability, consistency and permanency with their mother as quickly as possible — they *share an extremely strong bond* and this needs to be nurtured *as a family unit*." (Emphasis added.) The March 2011 Permanency Report from the guardian ad litem — six months before the termination trial — reported that "[b]oth children remain bonded with their mother."

Despite the overwhelming evidence that Zach and Abbie shared strong bonds with their mother, the State presented no evidence to the superior court as to the effect of terminating their mother's parental rights on the children. Moreover, a review of the testimony presented to the court shows that the State's case was almost entirely based on generalizations:

- The State's expert had never met the children, had never met the mother, and had never observed her with her children. The expert's testimony was in effect based on a review of the record. While we have endorsed the idea that expert testimony may be based on a record review,[2] the record review here was remarkably skimpy. The expert conceded that she "didn't read a lot about the kids," while stating that they were in a secure placement. Upon cross-

---

[2] *See C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1218 (Alaska 2001) (declining to hold that a meeting between the expert and the parties to the termination proceeding is necessary in every case, but reversing termination because the expert's opinion was not sufficiently based on the particular facts of the case); *J.J. v. State, Dep't of Health & Soc. Servs.*, 38 P.3d 7, 9-10 (Alaska 2001) (same).

examination, she admitted that she had not read *anything else* about the children other than that they were in a secure placement. The expert commented on the amount of time the children were out of the home in placement, but admitted that she did not know that for some of that time they lived with their mother or were cared for by her. (Indeed, the State admitted at trial that the children were in their mother's care for enough of the time that the children were in foster care that the State sought to recover part of its foster care payments from the foster parents for that time.) The expert was unaware of the amount of time the children had visited with their mother, and she did not know how frequently visitation took place, or how the visits went.

- The one social worker called by the State was not the assigned social worker, but was instead her supervisor. Almost all of her testimony consisted of generalizations about what kinds of harmful effects on children might be expected by the particular acts of parental neglect that were found in this case. While her testimony was strong in a general sense, it could not establish that *these* children suffered the harmful effects that might generally be expected.

In comparison with the generalizations upon which the State relied, the record contains substantial evidence that these children, especially Zach, were extremely bonded with their mother. The evidence showed that (1) Zach was very attached to his mother 17 months before the trial and that this attachment continued through the time of trial; (2) Zach had continually expressed his desire that his family (himself, his mother, and his sister) all stay together; (3) Abbie shared an extremely strong bond with her

mother; and (4) this bond continued up until the trial. Yet no evidence was produced at the trial as to the effect of a termination of parental rights on Zach and Abbie.[3] In light of this evidence of the strong connections between the children and their mother, the superior court should have weighed the loss of that bond in the best interests analysis. But it was unable to do so, because the State had not presented any evidence of the effect that termination of parental rights would have on the children.

Other than generalities, the court did not hear any testimony about these particular children, their needs and desires, their developmental states, or their progress in therapy. The court heard testimony from the social worker that termination can, depending on the child, result in trauma to a child, but the court heard no testimony about how *these* particular children might be impacted by termination of their mother's parental rights. The testimony and the trial court's findings in this case appear to have been based on the best interests of children in general, rather than on the best interests of Zach and Abbie in particular. The State's failure to present the court with evidence about the effect of termination on these particular children points up what I believe to be the legal error here: the reduction of the best interests finding to mere surplusage.

The legislature has set out five findings that a superior court must make before parental rights can be terminated: (1) that the child is in need of aid; (2) that the parental conduct remains unremedied; (3) that the State has made reasonable (or, in the case of Indian children, active) efforts to reunite the family; (4) that serious harm to the child will likely occur without termination; and (5) that termination is in the best interests of the child.[4] The testimony and the trial court's best interests findings in this case were

---

[3]      Indeed, when counsel for the mother attempted to bring before the court evidence of the children's preference at the time of trial, the State successfully resisted.

[4]      *See* AS 47.10.011; AS 47.10.086; AS 47.10.088.

based on the best interests of children in general, but not these particular children. But if courts were justified in determining only the best interests of "generic children" in making a best interests finding, it would appear that whenever all the other termination findings are satisfied — a child in need of aid finding, parental conduct remaining unremedied, reasonable efforts, and a substantial risk of harm to the child without termination — the best interests of the generic child will always be served by termination. But because we presume that the legislature intended that every part of a statute have some purpose, force, and effect,[5] the court must look at the best interests of the particular children before it.[6] That did not happen here.

Given the specific evidence in the record that these children were closely bonded to their mother just before the termination trial began[7] and the lack of evidence on this subject at trial, along with the lack of evidence regarding the children's particular

---

[5] *See Mechanical Contractors of Alaska, Inc. v. State, Dep't of Pub. Safety*, 91 P.3d 240, 248 (Alaska 2004) (holding that when court engages in statutory construction it will presume every provision of statute "to have some purpose, force, and effect, and that no . . . provisions are superfluous.").

[6] Perhaps in the case of an infant removed from a parent at or close to birth, who has had no opportunity to bond with the parent, a "generic child" analysis might suffice. But in the case of a 12-year-old like Zach, who was "very attached" to his mother and who "continually expressed his concern . . . that [his] family all stay together," a generic analysis is insufficient.

[7] The strongest evidence in this regard pertains to Zach. But the evidence concerning Abbie is also substantial: When she was almost five, she was described as having "an extremely strong bond" with her mother, which remained unchanged when she was a month short of six. And in light of the legislative findings contained in AS 47.05.065(5)(a) — "children undergo a critical attachment process before the time they reach six years of age . . ." — the superior court should have been provided updated information regarding Abbie's bonding with her mother at the time of the termination trial.

situations, including the preference of at least Zach in the matter,[8] I believe that we should vacate the superior court's best interest finding and remand so that the court can be provided with specific evidence pertaining to these children's best interests. Such evidence should include testimony by an expert who is at least well-versed in the facts pertaining to these children, and preferably one who has actually met Zach and Abbie and who can give expert testimony on the effect of termination on them: What is the state of their bonds with their mother? How will termination of the parent-child relationship affect their development? Are there permanency options available that might better serve the interests of these children than termination? It could include evidence by a social worker who has actually worked with these children, who knows their outlook and preferences, and can provide this information to the court. Armed with such information, the court could make an evidence-based decision on these children's best interests.

In evaluating what is in Zach and Abbie's best interests, the court would have options other than termination or reunification of the children with their mother. Although the testimony of the social worker suggested that these were the only options, the choice in a case such as this is not so simple. Federal and state law contemplate permanency outcomes in addition to termination or reunification, including guardianship and placement with a fit and willing relative.[9] We have stated that a trial court need not

---

[8]     *Cf.* AS 25.23.040(a)(5) (requiring court to obtain consent of minor child to adoption if child is ten years of age or older unless court dispenses with minor's consent in best interests of minor).

[9]     With regard to federal law, *see* 42 U.S.C. § 675(5)(C) (listing reunification, adoption, legal guardianship, placement with a fit and willing relative, and "another planned permanent living arrangement" as possible permanency outcomes). With regard to state law, *see* AS 47.10.083 (gradual reunification); AS 47.10.084 (legal custody and (continued...)

consider such arrangements in the course of termination proceedings "except to the extent that [AS 47.10.088] requires the court to order an arrangement that is in the child's best interest."[10] This is such a case. While we have, on numerous occasions, reiterated this holding in rejecting appellants' claims that a trial court erred in failing to consider or order guardianship in lieu of termination, in each such instance the trial court had, at some point, considered whether guardianship was an appropriate permanency outcome for the child, or had at least examined the particulars of the child's situation and found that continued contact between the child and the parent was not justified given the particular facts of the case.[11] In this case, the trial court conducted no such analysis or examination. Today's opinion also relies on *J.H. v. State, Department of Health and Social Services*[12] and *Hannah B. v. State, Department of Health and Social Services,*

---

[9](...continued)
guardianship); AS 47.10.080(c)(2) (placement with a fit and willing relative).

[10]      *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 57 (Alaska 2001).

[11]      *See Doug Y. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 243 P.3d 217, 219 (Alaska 2010) (child wanted father to go to jail "so his dad would quit beating him"); *A.J. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 62 P.3d 609, 615 (Alaska 2003) (parent had "history of interfering with the children's placements" justifying termination over guardianship); *Lucretia G. v. State, Dep't of Health & Soc. Servs.*, 2006 WL 668725 at *6 (Alaska 2006) (unpublished opinion) (child regarded further contact with mother as "cause for alarm"); *Matthew B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 2005 WL 628809 at *4 (Alaska 2005) (unpublished opinion) (superior court specifically considered guardianship but found that proposed guardian was unavailable for at least 12 months); *Christopher D. v. State, Dep't of Health & Soc. Servs.*, 2004 WL 243556 at *3 (Alaska 2004) (unpublished opinion) (guardianship not in best interests of severely emotionally disabled children dealing with attachment disorders who needed stable home environment).

[12]      30 P.3d 79 (Alaska 2001).

*Office of Children's Services*[13] as cases that resemble Thea G.'s case. But the children in *J.H.* and *Hannah B.* were only three years old and four years old respectively, and those cases clearly did not involve the types of mature bonding issues and expressed preferences as does the present case.

I agree with the superior court and today's opinion that Zach and Abbie's mother has failed them terribly in many ways and that she is not now fit to act as their parent. But that is not the question before us. The question is whether it is in the best interests of these children — both of whom are strongly bonded with their mother and one of whom has expressed the fervent desire that what remains of their family following their father's death be "kept together" — to sever the parental bond without considering the effect of doing so on the children, or even hearing from them, and without considering alternatives to termination. Before that decision can be made, the superior court should be provided direct evidence on this issue so that it can make an informed decision on what is in the best interests of these children. Because the court was not provided with that information, I respectfully dissent.

---

[13]     289 P.3d 924 (Alaska 2012).