NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DARRYL W., | ) |
| | ) Supreme Court No. S-17186 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-16-00657 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1738 – August 14, 2019 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Yvonne Lamoureux, Judge.

Appearances:  Lael A. Harrison, Faulkner Banfield, P.C., Juneau, for Appellant.  Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.  Marika R. Athens, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before:  Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.  Carney, Justice, concurring.

## I.    INTRODUCTION

A father appeals the termination of his parental rights.  He argues that the superior court erred by finding his daughter was a child in need of aid because he had

---

\*       Entered under Alaska Appellate Rule 214.

failed to make adequate arrangements for her care while he was incarcerated and because he had neglected her. He also argues that he received ineffective assistance of counsel with respect to the "adequate arrangements" issue. Finally, he argues that the expert witness trial testimony was insufficient for the required finding, beyond a reasonable doubt, that remaining in his custody was likely to cause his daughter serious emotional damage.

We conclude that the superior court did not err by finding the daughter was in need of aid due to the father's neglect, and because only one child in need of aid finding is necessary to support termination of parental rights, we do not reach the superior court's finding regarding "adequate arrangements" or the related ineffective assistance of counsel claim. We also conclude that the superior court did not err by finding the father's continued custody was likely to result in serious emotional damage to the daughter. We therefore affirm the superior court's termination decision.

## II.   FACTS AND PROCEEDINGS

### A.   OCS First Becomes Involved

Darryl W. is the father of Suki,[1] an Indian child under the Indian Child Welfare Act (ICWA).[2] Suki was born in March 2014; her mother is deceased.

In fall 2016 Darryl and Suki were living with his girlfriend, Esther S., and her three children at their friend Nia F.'s home in Anchorage. In October the Office of Children's Services (OCS) received a report "alleging mental injury and physical abuse"

---

[1]     We use pseudonyms to protect the privacy of those involved.

[2]     *See* 25 U.S.C. § 1903(4) (2018) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."). Suki's mother was a member of the Village of Crooked Creek, and Suki qualifies for tribal membership.

of Esther's children. An OCS caseworker visited the children's school, where she spoke to two of Esther's children, and Nia's home.

The caseworker reported that the children appeared healthy and clean, but she indicated concern that Esther's five-year-old son remained silent when she tried to interview him. Esther's seven-year-old son told her that he had to take timeouts at a wall when Darryl was angry but denied any physical or sexual abuse in the home. The caseworker noted that Esther's two-year-old daughter was at the home playing with Suki and appeared healthy.

When Nia was interviewed, she first said Darryl did not live at her home, she had not known him very long, there was no domestic violence in her home, and Esther was not at home. Nia soon admitted Darryl occasionally stayed at her home, but she said neither he nor Esther were there at the time. She then agreed to give the caseworker a tour of the home, and both Esther and Darryl were downstairs "lying on the bed watching TV."

The OCS caseworker interviewed Esther, who indicated that she and Darryl were "just friends" and that he did not live with her, but he stayed over sometimes and slept with her when he did. When asked about domestic violence, Esther said nothing physical occurred and the children did not see them arguing. When the OCS caseworker visited the home four days later and talked to Esther, she again denied any domestic violence; she stated she and Darryl were engaged to be married.

OCS received a second report in November, when Esther's younger son was observed at school with a two-inch bruise on his leg. The reporter also stated that Darryl had a lengthy criminal history and expressed concern about domestic violence in the home. Later that morning an OCS caseworker asked Esther's younger son what had happened, but he refused to speak. Esther's older son said his brother had been in trouble for breaking a remote control, but did not say who caused the bruise. The older

son also reported sometimes hearing Esther and Darryl arguing downstairs, but the son said he did not see what happened.

OCS learned that Darryl had an outstanding felony arrest warrant. Police officers went to Nia's home and arrested Darryl; he was found leaving through the back door after Nia told the officers he was not there. OCS caseworkers went to the home after Darryl's arrest to speak to Esther concerning her children's safety and her son's bruise. When Esther and Nia failed to create a suitable plan to ensure the children's safety, OCS removed Esther's three children and Suki from the home and assumed emergency custody.[3]

## B.    OCS Custody

OCS filed an emergency petition for temporary custody of Suki the following day.[4] OCS alleged that Suki was in need of aid because Darryl was incarcerated, there was domestic abuse occurring at the home, and there was a risk she could be exposed to mental injury or neglect.[5] The superior court scheduled an

---

[3]     *See* AS 47.10.142 (authorizing OCS to take emergency custody of child under enumerated conditions with direction to petition for court order regarding child in need of aid).

[4]     *See* AS 47.10.080(c)(1) (authorizing court to grant OCS temporary custody of child in need of aid); CINA Rule 6 (regarding emergency custody proceedings).

[5]     *See* AS 47.10.011 (enumerating circumstances in which "court may find a child to be a child in need of aid"). The superior court found Suki to be in need of aid after OCS filed a petition under subsections (2) "a parent . . . is incarcerated, the other parent is absent . . . , and the incarcerated parent has not made adequate arrangements for the child;" (6) "the child has suffered substantial physical harm, or there is a substantial risk . . . [of] substantial physical harm;" (8)(B) "conduct by or conditions created by the parent, . . . have . . . placed the child at substantial risk of mental injury"; and (9) "conduct by or conditions created by the parent . . . have subjected the child . . . to neglect."

emergency probable cause hearing for late November. Following multiple continuances of the hearing, Darryl requested that his daughter visit him in jail. OCS indicated that visitation would be addressed within the week.

Because Darryl and Suki are not related to Esther or her children, Suki's case was handled separately. After OCS assumed emergency custody of Suki, Darryl suggested letting her stay with Esther or Nia. OCS did not agree that either was appropriate. A caseworker asked Darryl for names of relatives in Anchorage with whom Suki could stay. Although Darryl confirmed there were relatives with whom Suki could be placed, he provided no names. At some point he suggested that Suki be placed with Lydia V., his former girlfriend. Darryl and Lydia had two daughters who thus were Suki's half-sisters. Suki remained in a foster home for two months, but OCS then placed her with Lydia.

Darryl remained in prison in Wasilla until February 2017. While in prison he asked that Suki not visit him because he did not want her transported on icy winter roads. After Darryl was transferred to a halfway house in Anchorage, he requested visits. It took OCS at least until late April to make arrangements, and Darryl then attended visitation regularly.

For the next six months, Darryl remained at the halfway house and worked on his OCS case plan to eventually reunite with Suki. The case plan established specific goals: finding housing, finding and keeping gainful employment, providing a nurturing environment for Suki, and staying out of jail.

While Darryl was at the halfway house, he and his attorney participated in numerous hearings with OCS, Suki's guardian ad litem (GAL), and tribal representatives. Darryl stipulated at one hearing that Suki was a child in need of aid due

to neglect and that OCS had made active efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[6]

In late August Darryl "walked away" from the halfway house. A warrant was issued for his arrest; neither his probation officer nor OCS had contact with him.

On November 1, while Lydia was at work, Darryl went to her home. Lydia spoke with him by phone and asked him to leave, but he did not. Lydia retrieved Suki from daycare and returned home; Darryl walked to the car, picked up Suki, and left. Lydia called the police; she then called Darryl and asked him to bring Suki back, but he refused.

The next morning the police found and arrested Darryl. But Darryl did not immediately comply with orders to surrender. He instead held Suki "in a bear hug" for about four or five minutes before putting her down and surrendering without further incident. Suki was returned to Lydia.

OCS then changed its permanency goal for Suki from reunification to adoption. Although OCS and Darryl previously had discussed giving Lydia guardianship of Suki, the permanency goal changed to Lydia adopting Suki. OCS feared that guardianship would not provide Suki with the permanency she needed because Darryl could interfere with and disrupt a guardianship.

At a December permanency hearing, OCS advised the superior court of the change in goals and contended that adoption by Lydia complied with the ICWA preference for relative placements because she was the mother of Suki's two half-sisters.[7] The GAL testified that Lydia and Suki had a strong bond. Darryl objected to adoption

---

[6] *See* 25 U.S.C. § 1912(d) (2018) (requiring active efforts finding at placement hearings); CINA Rule 15(f)(2).

[7] *See* 25 U.S.C. § 1915(a) (2018) (giving placement preference to child's extended family).

and to Suki remaining with Lydia. The court approved the changed goal and found that Suki's placement with Lydia was appropriate and in Suki's best interests.

## C. Termination Trial

OCS filed a termination petition in April,[8] and the termination trial took place in June. The superior court issued its written order terminating Darryl's parental rights in July.

The court found by clear and convincing evidence that Suki had been subjected to conduct or conditions described in AS 47.10.011 (2) (incarcerated parent's failure to make adequate arrangements for care) and (9) (parental neglect). After making all other required findings — including the ICWA-required finding beyond a reasonable doubt that Darryl's continued custody of Suki likely would lead to serious emotional and physical damage — the court terminated Darryl's rights to Suki, committed Suki to OCS's custody, and authorized OCS to consent to adoption or guardianship. "Based on

---

[8]        Under ICWA and relevant Alaska Child in Need of Aid (CINA) statutes and rules, parental rights to an Indian child may be terminated at trial only if OCS shows:

(1) by clear and convincing evidence that: (a) the child has been subjected to conduct or conditions enumerated in AS 47.10.011 (CINA Rule 18(c)(1)(A)); (b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent (CINA Rule 18(c)(1)(A)(i) - (ii)); (c) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family (CINA Rule 18(c)(2)(B)); and

(2) beyond a reasonable doubt, including qualified expert testimony, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child (CINA Rule 18(c)(4)); and

(3) by a preponderance of the evidence that the child's best interests would be served by termination of parental rights (CINA Rule 18(c)(3)). *See* AS 47.10.011, 47.10.080(o), 47.10.088; 25 U.S.C. § 1912(d), (f) (2018).

the extraordinary circumstances of this case," Darryl was granted post-termination contact with Suki, and the court recommended any adoption or guardianship decree include a provision that he receive updates and be allowed to exchange gifts and letters with Suki.

Darryl filed a motion to stay the termination order pending appeal. The next day Darryl filed a motion to reconsider the scope of his post-termination contact with Suki to include visitation, because during trial OCS had indicated that it would allow visits. The superior court denied the stay but granted the motion for reconsideration, calling for at least monthly visitation and an increase to twice monthly if future resources allowed.

### D. Appeal

Darryl appeals the termination of his parental rights. He raises four arguments: (1) the superior court's factual findings were insufficient to establish by clear and convincing evidence that Darryl subjected Suki to neglect; (2) the evidence at trial did not support a finding by clear and convincing evidence that Darryl failed to make adequate arrangements for Suki while he was incarcerated; (3) Darryl received ineffective assistance of counsel in connection with the issue of his failure to make adequate arrangements for Suki while he was incarcerated; and (4) the expert witness testimony at trial was inadequate to support a finding beyond a reasonable doubt that Suki was likely to suffer serious emotional or physical damage from Darryl's continued custody. We need to address only the first and last arguments.

## III. STANDARD OF REVIEW

In a CINA case, "we review a superior court's findings of fact for clear error."[9] A finding of fact is clearly erroneous "if a review of the entire record in the light most favorable to the party prevailing below leaves us with a definite and firm conviction that a mistake has been made."[10]

"Whether the superior court's factual findings satisfy the CINA statutes is a question of law that we review de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[11] We review de novo whether the superior court's findings and the expert testimony presented at trial satisfy CINA and ICWA requirements.[12]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Finding Suki A Child In Need of Aid Based On Neglect.

To terminate a parent's rights and responsibilities, the superior court must find by clear and convincing evidence that a child has been subjected to conditions

---

[9] *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010).

[10] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 961-62 (Alaska 2013) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[11] *Kylie L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 407 P.3d 442, 448 (Alaska 2017) (quoting *Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 311 P.3d 637, 643 (Alaska 2013)).

[12] *Eva H. v. Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1052, (Alaska 2019); *Thea G.*, 291 P.3d at 961-62.

qualifying the child as in need of aid under one of the subsections of AS 47.10.011.[13] The superior court found that Suki was a child in need of aid on two grounds: that Darryl had failed to make adequate arrangements for her care while he was incarcerated and that she had been neglected.[14] We address only the latter finding.[15]

Alaska Statute 47.10.011(9) allows the superior court to find a child in need of aid when "conduct by or conditions created by the parent . . . have subjected the child . . . to neglect." Alaska Statute 47.10.014 allows a court to find neglect if the parent "fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development, though financially able to do so or offered financial or other reasonable means to do so."

Darryl argues that the superior court "made no factual findings, nor was any evidence presented at trial, that [Suki] ever lacked adequate food, shelter, clothing, education, medical attention, or other care." Although the court did not list its findings with its final neglect determination, its written order provides the following findings establishing neglect by clear and convincing evidence.

When Darryl first was arrested, Suki was in Esther's care, but Esther was not an appropriate placement because she was not a protective caregiver for her own children. Darryl then for some time failed to cooperate with OCS to find an appropriate placement for Suki, refusing to provide names of relatives who might be placements.

---

[13]  AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[14]  *See* AS 47.10.011(2), (9).

[15]  *See Rick P. v. State, OCS*, 109 P.3d 950, 956 (Alaska 2005) (noting it is unnecessary to consider other findings if record supports one ground for finding child to be in need of aid). For this reason we also do not address Darryl's related ineffective assistance of counsel argument.

Although Darryl arguably remedied this conduct and condition by later suggesting Lydia as an appropriate placement[16] — which OCS evidently agreed with[17] — he subsequently engaged in further neglectful conduct.

After Darryl was released from prison to the halfway house, he began appropriate visitation with Suki. But the superior court noted that after six months, Darryl unlawfully walked away from the halfway house and effectively disappeared from Suki's life for two months. Assuming Darryl intended to reunite with Suki in accordance with his case plan — requiring visitation to keep the parent-child bond in place — this was a failure to provide for Suki's mental health and development.

---

[16] *See Duke S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1127, 1135 (Alaska 2018) (concluding that when incarcerated parent requested placement with licensed foster care provider, OCS's failure to act for over one year before denying request without notice to parent, and its related failure to ask parent for additional placement names, could not support child in need of aid finding under AS 47.10.011(2) (incarceration)); *Claudio P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 860, 864-65 (Alaska 2013) ("[W]e have never decided whether an incarcerated parent's request that a child — already in OCS's custody — be placed with a particular individual constitutes making 'adequate arrangements' . . . for the child's care. . . . [But] waiting more than a year before taking steps to arrange for [the child's] care ultimately rendered the steps that [the parent] did take inadequate."); *see also Josh L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 457, 466-67, 468-76 (Alaska 2012) (setting out competing views, in divided 2-2 opinion, about OCS's active efforts obligation to assist incarcerated parent to make adequate arrangements for child).

[17] *See* AS 47.10.084(a) (imposing on OCS, when possessing legal custody of child in need of aid, "responsibility of . . . determin[ing] . . . where and with whom the child shall live"); 25 U.S.C. § 1915(b)(i) (2018) (granting preference in foster care placement of Indian child under ICWA to "a member of the Indian child's extended family").

Darryl then appeared at Lydia's home and essentially kidnaped Suki, taking her away from her home and foster parent — the person Suki considered her mother — without providing any information about where they were going. Taking Suki from her home without her necessary belongings and keeping her while a fugitive from the law reflect a failure to provide adequate clothing and housing, at the very least. And Darryl refused to return Suki to Lydia upon her demand, instead keeping Suki with him while he was a fugitive from the law and placing her at risk of physical and emotional harm in the event of a confrontation with police. The superior court specifically found that when the police confrontation took place, Darryl had "placed [Suki] in dangerous situations as a result of his disregard of the law."

The superior court noted that even when later confronted with information that Suki was in therapy for mental trauma as a result of his police confrontations in her presence, Darryl "denie[d] any responsibility and refuse[d] to acknowledge [Suki's] needs." The court specifically noted Darryl's position that "everything is fine with [Suki]." The court specifically found that Darryl failed to prioritize Suki's needs and that his "criminal mindset takes priority over his parental responsibilities." This is evidence of neglect.

Finally, although not mentioned in the superior court's written order, we note Darryl's prior stipulation that Suki was a child in need of aid due to his neglect. That stipulation could have been considered along with other evidence of neglect presented at a termination trial to reach the child in need of aid determination.[18]

---

[18] *See Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1256 (Alaska 2010) ("[A] court can consider a parent's stipulation and any other evidence offered at a prior adjudication hearing along with additional evidence presented at the trial in finding a child to be in need of aid for purposes of termination of parental rights.").

In light of the foregoing, and on the unique facts of this case,[19] we reject Darryl's argument that the superior court's finding that Suki was a child in need of aid due to neglect is clearly erroneous or otherwise legally insufficient.

**B.      The Superior Court Did Not Err By Finding That Returning Suki To Darryl's Care Was Likely To Result In Serious Harm.**

Under ICWA parental rights may not be terminated absent "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[20] This finding requires a showing that Darryl committed harmful conduct and that the conduct was likely to continue.[21]

Darryl raises three arguments why the superior court erroneously found that returning Suki to his care likely would result in serious emotional or physical damage: first, the expert was not adequately familiar with the particular facts of his case; second, the burden was inappropriately placed on him to prove he was a fit parent rather than on OCS to prove the opposite; and third, the superior court's findings were not supported by the expert's opinion.

---

[19]      We note that other subsections of AS 47.10.011 — including (6) (substantial risk of physical harm) and (8)(B) (substantial risk of mental injury) — also may have applied to the facts of this case. Although Darryl's behavior and the harm to Suki may have been better characterized under other subsections, based on these facts we nonetheless may affirm a neglect finding.

[20]      25 U.S.C. § 1912(f) (2018).

[21]      *See C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1218-19 (Alaska 2001) (holding evidence was insufficient to find that parental conduct at issue was likely to continue).

### 1.    The expert witness testimony

Darryl argues that the "expert's testimony was inadequately prepared and therefore not based on the particular facts and issues of the case," in violation of ICWA requirements. He contends that the expert's failure to interview anyone when preparing her report and her limited review of the OCS file covering only the previous four months of caseworker notes rendered her preparation insufficient as an expert witness. He additionally emphasizes that the expert neither spoke to Suki's therapist, reviewed her therapy records, nor spoke to "anyone who had observed visits between father and daughter."

As OCS notes, "it is well settled that an ICWA expert may testify based on a review of documents in the record, without having had any personal contact with the parties, as long as the witness's testimony is grounded in the facts and issues specific to the case before the court."[22] "[A] meeting between the expert and the parties to the termination proceeding is [not] required in every case. But the expert opinion should be based on the particular facts and issues of the case."[23] In this case the expert witness reviewed limited caseworker notes, court records, some police records, interview notes, a medical evaluation for suspected physical abuse and neglect after the police found Suki in Darryl's care, protective services reports, court reports, notices of denial of placement, and the petition for termination of parental rights. This is an adequate review to form an expert opinion.[24]

---

[22]    *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 965 (Alaska 2013).

[23]    *C.J.*, 18 P.3d at 1218.

[24]    *Compare Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 507 (Alaska 2009) (holding sufficient qualified expert witness who did not speak with parent

(continued...)

Under Bureau of Indian Affairs (BIA) regulations, a qualified expert witness "must be qualified to testify" about the causal relationship between a parent's custody of a child and harm to the child's emotional and physical well-being.[25] "[T]he evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child who is the subject of the child-custody proceeding."[26]

In this case the expert witness discussed Darryl's specific behavior and its particular impact on Suki. For example, the expert witness discussed how Suki was traumatized by memories of the police coming to arrest Darryl while she hid under a table. The expert witness testified that Darryl either compounded or added another layer to this trauma when he kidnapped Suki and she again had to experience him being arrested by the police. The expert witness also discussed Darryl's lack of "understanding of his daughter's . . . emotional needs at this time." These are not generalizations about difficulties facing a child with an incarcerated or neglectful parent but are particular to Suki's needs and Darryl's actions.

---

[24] (...continued)
or child but did review case file, trial exhibits, police reports, other records, and spoke with OCS), *with C.J.*, 18 P.3d at 1218 (holding insufficient expert witness who used only State file and gave generalized conclusions without discussing case particulars), *and J.J. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 38 P.3d 7, 10 (Alaska 2001) (holding insufficient expert witness who did not speak with parent or children, used "significantly incomplete" file, and was unaware of treatments completed).

[25] 25 C.F.R. § 23.122(a) (2019); *see Eva H. v. Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1053-54 (Alaska 2019) (discussing revised BIA regulations).

[26] 25 C.F.R. § 23.121(c) (2019).

### 2. The burden of proof

Darryl argues that the expert witness wrongfully placed the burden on him to prove he was a fit parent. Darryl cites testimony that the expert witness had insufficient information to speak about his parenting ability, seemingly placing the onus on him to provide such information. But "[t]he findings of a likelihood of serious emotional or physical damage are findings that must be made by the trial judge, not the expert witness."[27] The superior court properly placed the burden on OCS to prove Darryl was likely to cause Suki serious emotional damage, rather than on Darryl to prove the contrary (as explained in the next section discussing evidence supporting the court's findings). How some expert witness testimony is phrased is not relevant to who carried the burden. For this reason the court's use of the expert testimony did not erroneously place the burden on Darryl.[28]

### 3. The superior court's findings

Darryl argues that the superior court's findings "went beyond the opinions given by the expert and therefore were not supported by the evidence." This argument fails, however, because the evidence supporting the finding need only "includ[e] testimony of qualified expert witnesses," and need not be based solely upon it.[29] "ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion; ICWA simply requires that the testimony support that conclusion."[30]

---

[27]    *Marcia V.*, 201 P.3d at 508.

[28]    *See C.J.*, 18 P.3d at 1218 (holding State failed to meet burden to prove unfit parent despite fact "that C.J. made no effort to demonstrate his fitness as a parent" for substantial period).

[29]    25 U.S.C. § 1912(f) (2018).

[30]    *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, (continued...)

Darryl specifically challenges the superior court's finding that Suki had experienced trauma when witnessing his arrest and that this trauma was his responsibility. But testimony supported this finding: Lydia said Suki "was having some nightmares about . . . issue[s] with the police, like . . . she think[s] the police [are] going to come get her"; Lydia said Suki told stories about Darryl being arrested and "how she was under a table [when the police came]"; and the expert witness "gleaned from the documents that [Suki] . . . continued for a while to have the night terrors return." The expert witness also supported the court's finding when she testified that "[Suki] has clearly experienced some trauma, and her elevation of trauma response increased after she was returned back into [Lydia]'s care after the absconding [by Darryl]." It thus was not clearly erroneous for the superior court to find that Darryl's most recent arrest after essentially kidnaping Suki re-exposed her to trauma and that his actions were the cause.

Darryl also argues that the expert witness "declined to give an opinion regarding whether [Suki] would likely suffer harm if returned to [Darryl's] custody after the end of his incarceration." Darryl cites the expert's testimony that "it's really hard for me to make a statement . . . if he was simply released this week . . . that, yes, he would be ready to parent at this time because there has not been enough assessment period for that to be really looked at." But the expert also said that Darryl's kidnaping Suki re-exposed her to prior traumas related to a fear of him being arrested by the police and had a negative impact on her; the expert said she had "heard no testimony today or in the records that indicate that [Darryl] has an understanding of his daughter's emotional . . .

---

**30**    (...continued)
291 P.3d 957, 966 (Alaska 2013) (quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 992 (Alaska 2002)).

needs at this time.  And that is an area that . . . would have needed to be addressed."[31] The superior court could take this as causal evidence that Darryl's continued custody of Suki, without understanding her emotional needs and acknowledging the trauma he had put her through, "will result in serious emotional or physical damage to the particular child."[32]

### 4. Summary

Based on the foregoing, we reject Darryl's arguments that the superior court erred by finding, beyond a reasonable doubt, that returning Suki to his custody would likely result in serious emotional or physical damage.

## V. CONCLUSION

We AFFIRM the superior court's termination decision.

---

[31] *See Marcia V.*, 201 P.3d at 508 (rejecting argument that ICWA expert testimony must recite statutory language).

[32] 25 C.F.R. § 23.121(c) (2019).

CARNEY, Justice, concurring.

I agree with the court that the superior court did not clearly err by finding that Suki was in need of aid due to Darryl's neglect. But I write separately because I disagree that some of the findings on which the court relies constitute neglect under AS 47.10.011(9), and with its treatment of the separate statutory grounds for child in need of aid findings.

As the court recognizes, Darryl's decision to leave Suki with an inappropriate caregiver and his failure to prioritize Suki's needs over his "criminal mindset" by not acknowledging the child's needs and continuing to engage in criminal activities without regard to their effect on Suki are "evidence of neglect."[1] Darryl's earlier stipulation that Suki was in need of aid due to his neglect also supports the superior court's finding.

But I disagree that his seizing Suki away from Lydia, refusing to return her, and placing her in the midst of his standoff with police was "neglectful."[2] "Neglect" implies, and is defined in terms of, failure to act.[3] But Darryl's conduct was deliberate and active — and is better addressed, as the court concedes,[4] by other sections of the relevant statute.

Darryl's absconding with Suki and then subjecting her to the events leading to his eventual surrender to police and return to jail were not neglectful: they created at

---

[1] Op. at 10, 12.

[2] Op. at 12.

[3] *See O.R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 968 P.2d 93, 97-98 (Alaska 1998) (discussing neglect as failure to provide for child's physical needs).

[4] Op. at 13, n.19.

the very least "a substantial risk that the child w[ould] suffer substantial physical harm" as well as a "substantial risk of mental injury."[5]

Alaska Statute 47.10.011 sets out 12 separate bases on which a child may be found to be in need of aid, noting that the court may find the child in need "if . . . the child has been subjected to *any* of the following [bases]."[6] We must presume that the legislature meant every word in the statute it drafted.[7] The CINA statute differentiates a dozen separate grounds requiring the State to intervene to provide aid to a child.[8] The court's disregard of the legislature's separation of the grounds based upon different parental conduct, and therefore different evidentiary requirements to prove their application, fails to conform with the legislative intent.[9] For that reason I limit my agreement to affirm the superior court to only those findings that clearly indicate neglectful rather than actively dangerous conduct.

---

[5]     AS 47.10.011(6), (8)(B).

[6]     AS 47.10.011 (emphasis added).

[7]     *Johnson v. State*, 380 P.3d 653, 656 (Alaska 2016) ("We 'presume that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous.' " (quoting *Nelson v. Municipality of Anchorage*, 267 P.3d 636, 642 (Alaska 2011))).

[8]     AS 47.10.011; *see also* CINA Rule 18(c)(1)(A).

[9]     The State did not allege additional bases during the termination trial for finding Suki in need of aid, indicating that the State made a deliberate tactical decision not to pursue these additional grounds.